**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Michael Dean WILLIAMS,
Defendant-Appellant.**

No. 80–1857.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Aug. 6, 1981.

Decided Nov. 30, 1981.

As Corrected Feb. 8, 1982.

Irwin Schwartz, Federal Public Defender, Seattle, Wash., for defendant-appellant.

Michael P. Ruark, Asst. U. S. Atty., Seattle, Wash., argued for plaintiff-appellee; Harry J. McCarthy, Asst. U. S. Atty., Tacoma, Wash., on brief.

Before SCHROEDER and ALARCON, Circuit Judges, HATFIELD *, District Judge.

ALARCON, Circuit Judge.

Michael Dean Williams (Williams), after a jury trial, was found guilty of violating 18 U.S.C. §§ 2 & 894 (conspiracy, attempt to collect, and collection of a debt by extortionate means). For the reasons set forth below we reverse the conviction.

FACTUAL BACKGROUND

In August, 1979, Williams was approached by Michael Farmer. Farmer was seeking a $5,000 loan and had been unsuccessful in his attempts to obtain the money through conventional lending sources.

Williams told Farmer that he could not make the loan but that he would see if he had any friends who could. Shortly thereafter, Williams introduced Farmer to Vincent Marcheselli and co-defendant Hal Jenkins; Williams left after the introductions were made. Marcheselli and Jenkins agreed to lend $5,000 to Farmer on condition that Farmer repay $8,000 within ninety days. Farmer agreed.

In mid to late October, before the loan was due, Farmer began receiving threats concerning repayment from Don Henry, who was introduced to Farmer by Marcheselli. Finally, in late November, Farmer decided to go to the F.B.I.

The F.B.I. agents undertook an investigation and arranged to have Farmer cooperate in their investigation by having him wear a body recorder in order to tape any subsequent conversations with the defendants. Portions of the resulting tape recordings were introduced at trial against Williams and Jenkins. Marcheselli pled guilty before the trial and testified for the government.

At trial, the government's evidence against Williams consisted primarily of tape recorded conversations between Farmer and the defendants, and the testimony of Farmer and Marcheselli. There was evidence that could reasonably have been construed as showing that Williams participated in the loansharking arrangement. For example, it could be inferred from the taped conversations that Williams had some knowledge of the details of the loan agreement with Farmer.[1] Furthermore, some parts of Williams' discussions with Farmer could support an inference that Williams was indirectly threatening Farmer by stat-

---

* Hon. Paul G. Hatfield, United States District Court Judge for the District of Montana, sitting by designation.

1. In one conversation with Farmer, Williams asked the following questions concerning when Farmer was going to make a payment.

WILLIAMS: So what do things look like now? As far as you really can tell?
FARMER: Hopefully, Monday.
WILLIAMS: I mean seriously, what do you really think?
FARMER: That's seriously.
WILLIAMS: Do you really think that or you just hope that? (Pause) I mean it ain't gonna go nowhere but here.
RT: 111–12.

Approximately two weeks later, Williams explained to Farmer how the interest income on the loan was to be distributed.

WILLIAMS: The reason I asked [when Farmer would repay Jenkins is] 'cause I'd like to get the five from him, too. That'd make a Merry Christmas.
FARMER: Oh, does he owe you five and Vince [Marcheselli] five?

WILLIAMS: Ah, he don't owe Vince anythin', but he owes me money.
FARMER: Oh, Vince owed Hal [Jenkins] money, though.
WILLIAMS: Yeah.
FARMER: So Hal just owes you five hundred then, huh?
WILLIAMS: Yeah. But he don't owe me till you pay.
FARMER: Yeah. What is that? Just a finder's fee? Is that all that is?
WILLIAMS: Mm hmm. (Pause) 'Cause [sic] Hal gets a pretty good chunk.
FARMER: Huh?
WILLIAMS: Hal gets a thousand of it, ah, in his own pocket.
FARMER: Oh, he actually gets two and then you guys each get ...
WILLIAMS: I don't ... he don't actually get two. He actually get's one. We get five apiece.
FARMER: Oh, from whoever, huh?
WILLIAMS: Yes, that's the way it was told to me. The only reason Hal's gettin' more is 'cause he's top dog.
RT: 209–10.

ing that Farmer would be physically injured by others.[2] There was also evidence that Williams had received money from Farmer [3] and that Marcheselli was concerned about seeing that "little Mike" got his money.[4]

The heart of Williams' defense at trial was that he did not have the necessary intent to commit the crime of loansharking. He attempted to persuade the jury that he was not part of the extortion scheme [5] and that his only purpose in introducing Marcheselli to Farmer was because Farmer was in desperate need of the money and had exhausted conventional financing sources.[6] Once arrangements for the loan had been made, Williams contended that he was merely acting as a friend to Farmer in passing on information to him concerning the seriousness of his situation.

Williams raises several issues on appeal including the undue restriction of his attempt to impeach Marcheselli. Because this issue is dispositive of the case, we discuss it first.

### RESTRICTION OF THE ATTEMPTED IMPEACHMENT OF MARCHESELLI

Williams asserts that he was unduly restricted in his cross-examination of Marcheselli, a key government witness, in violation of the confrontation clause of the sixth amendment. According to Williams, the trial judge's refusal to admit a prior inconsistent statement of Marcheselli's into evidence severely curtailed his ability to establish a defense. *See Davis v. Alaska*, 415 U.S. 308, 316, 94 S.Ct. 1105, 1110, 39 L.Ed.2d 347 (1974), *Burr v. Sullivan*, 618 F.2d 583, 586 (9th Cir. 1980), *United States v. Harris*, 501 F.2d 1, 8 (9th Cir. 1974).

The government objected to the admission of a prior inconsistent statement, identified as Exhibit "A", on the basis that it was "an unsigned statement" but did not cite any authority to support the objection. The trial judge reserved ruling on the objection. Defense counsel properly authenticated Exhibit "A" pursuant to Fed.R.Evid. § 901(b)(1) through testimony of Marcheselli who admitted making the statement and that it was true, RT: 482–83, and by calling a witness, Bonnie L. Robbins, to testify that Marcheselli read the statement and agreed to its veracity.[7]

---

**2.** The following excerpt of a conversation between Williams and Farmer is illustrative:
FARMER: What is gonna happen, man?
WILLIAMS: You know what's gonna happen, Mike.
FARMER: Are they gonna go after my kids, though?
WILLIAMS: No, they're gonna ... they're gonna kill you.
RT: 115.

**3.** Williams was to receive $250 as a finder's fee. According to Farmer's uncontroverted testimony, however, Williams did not ask him for any money; he simply offered the money to Williams on his own initiative. The F.B.I. instructed Farmer to call Williams to make arrangements to pay the money to Williams.

**4.** Marcheselli, talking to Farmer, was explicit: "what about, un, little Mike's money?" RT: 269. In a later conversation also with Mike Farmer, Marcheselli said: "Do watcha can for me, I'll take care of Mike." RT: 297. Farmer testified that Mike or little Mike was a reference to Mike Williams.

**5.** There is evidence in the taped conversations that supports Williams' defense. *See* text, *infra*. It was also supported by testimony at the trial. Williams testified that Marcheselli would tell Williams how angry he was with Farmer

when the loan was past due and that he was going to "do" something to Farmer. Williams, concerned that Marcheselli would injure Farmer, told Farmer about the seriousness of his situation.

**6.** Farmer told Williams that he was involved in a drug deal and that $5,000 worth of cocaine had been destroyed in a fire at his house. The drug people had advanced him the cocaine and now they wanted their money. He was "terribly afraid." Farmer, in fact, needed the money to repay John Bergen the money that Bergen had advanced to Farmer for the purchase of some equipment. Bergen had indicated to Farmer that he was going to go to the police if Farmer did not repay the loan.

**7.** Q. Were you present last night at a meeting between Vince Marcheselli and myself?
A. Yes.
Q. Tell the jury, please, whether or not Mr. Marcheselli read the document that has now been marked as an exhibit.
A. Yes, he did.
Q. After he read it, was he asked whether it was all true?
A. Yes.
Q. Did he indicate that he wanted any changes made?

On direct examination, Marcheselli testified that he may have talked to Williams about "putting pressure on Mr. Farmer to make payment." RT: 476. This testimony was important to the prosecution's case and therefore damaging to the defense because it tended to prove that Williams acted with criminal intent in that he attempted to frighten Farmer into complying with Marcheselli's demands in furtherance of the conspiracy. Marcheselli, on cross-examination, however, several times denied telling Williams that Farmer was going to be hurt if he did not pay.[8] The night before Marcheselli testified, he made the following statement to defense counsel:

I, Vincent Frederick Marcheselli, being first duly sworn and upon his oath, deposes and says:

On a date I don't remember in late July or early August, Mike Williams came to me and said he had a friend who was in terrible trouble because of a cocaine deal. The friend needed $5,000.00 and Mike wanted to know if I or anyone else I knew could lend it to him. I asked a number of people including Hal Jenkins.

Mike Williams introduced Mike Farmer to me and Hal Jenkins at the Yorktown. He left as soon as the introductions were made. He was not there when Jenkins, Farmer and I set the arrangements for the loan.

At no time did I use or try to use Mike Williams to scare Mike Farmer. Mike Williams had nothing at all to do with that. I did not at any time discuss the plan to scare Mike Farmer with Mike Williams.

I did tell Mike Williams that Mike Farmer was not paying and I did tell Mike Williams the same lies that I told Mike Farmer. *I led Mike Williams to believe that there really was a "They" who were going to come down on Mike Farmer and later on me.*

*Mike Williams had no part in collecting the money at all.*

(Emphasis added)

This statement was contained in the unsigned writing offered as Exhibit "A".

■ Exhibit "A" was admissible under Fed.R.Evid. 613 (witness may be impeached by extrinsic evidence of prior inconsistent statement)[9] in that Williams properly attempted to introduce evidence of a prior inconsistent statement by Marcheselli only after Marcheselli had the opportunity to

---

8. Marcheselli testified as follows:
 Q. To you [sic] recollection today, do you remember any occasion when you said to Mike Williams, "I want you to scare him," to the best of your recollection?
 A. It has been so long ago.
 Q. Let me ask it a different way. At any time did you discuss with Mike Williams your plan to scare Farmer into paying?
 A. We may have, some.
 Q. Let me ask it this way: you did tell Mike Williams that people were going to do harm to Farmer; am I correct?
 A. No, I didn't tell him that.

 A. Yes.
 Q. What was that?
 A. He wanted it—
 Q. That was crossed out in his presence?
 A. Yes.
 Q. After that was crossed out, was he again asked if, after this correction, it was all true?
 A. Yes.
 Q. What was his answer?
 A. Yes, it was all true.
 Q. Did he hedge on that in any way?
 A. No.

 Q. You never told him that?
 A. No, sir.
 Q. Did you tell him that you intended to have Farmer hurt?
 A. No, I did not.
 Q. You don't remember telling him anything at all about that?
 A. No, sir.
 RT: 478.

9. Fed.R.Evid. 613(a) provides that a witness may be impeached during examination by a prior statement, whether written or not, and the statement need not be shown to the witness nor must the contents be disclosed at that time. *United States v. Rogers*, 549 F.2d 490, 497 (8th Cir. 1976), *cert. denied*, 431 U.S. 918, 97 S.Ct. 2182, 53 L.Ed.2d 229 (1977). Furthermore, extrinsic evidence of the prior inconsistent statement is admissible where the witness has had the opportunity to explain or deny the statement and the opposing party has the opportunity to question the witness about the statement. Fed.R.Evid. § 613(b).

explain or deny the statement.[10] The trial judge, however, sustained the government's objection to the admission of Exhibit "A" and in so doing committed error.

We find the error in excluding the impeachment evidence prejudicial for the following reasons. First, the evidence introduced to prove Williams' guilt was subject to more than one interpretation. Although the evidence does support a jury finding of guilty, it could also have supported a finding of not guilty. Serious doubts are raised by the prosecution's own evidence concerning Williams' intent as evidenced by the following taped conversation:

FARMER: So Mike's just kind of is a go-fer then, isn't he?

MARCHESELLI: Who?

FARMER: Mike.

MARCHESELLI: Mike? Mike who?

FARMER: Williams.

MARCHESELLI: Well, he's not even involved in it.

FARMER: Well, no, I mean, as far as just . . .

MARCHESELLI: He's just a friend.

FARMER: . . . puttin' . . . puttin' me . . . Well, yeah, but he must know something that's going' [sic] on.

MARCHESELLI: Oh, he knows . . . He, uh, he knows that I can get a hold of the money and that's all he knows. RT: 85–86.

Furthermore, the taped conversations between Williams and Farmer that the government argued contained threats by Williams could also have reasonably been construed as a friend's concern about the seriousness of Farmer's situation (in response to questions from Farmer).[11] Moreover, the evidence is undisputed that the taped conversations often occurred when the participants had been drinking heavily. The F.B.I. provided Farmer with money to buy drinks during these meetings; during one meeting that lasted a little more than an hour, Farmer purchased seven rounds of drinks. Statements by the participants during these meetings could thus have been reasonably discounted by the trier of fact.

Second, assuming that the prosecution's evidence shows that Williams acted with the requisite criminal intent, a review of the entire record indicates that at worst, he was a peripheral figure in this matter. Williams was responsible for the introduction of Farmer to Marcheselli; he was not involved in setting the repayment terms of the loan.[12] Once the loan negotiations were completed, Williams had little contact with Farmer concerning the loan. There was no evidence that Williams ever attempted to collect the money from Farmer although he did discuss the loan with Farmer. Out of the total sixteen taped conversations involving discussions about the loan, Williams was involved in only three. Furthermore, none of these conversations was instigated by Williams. Two were arranged by Farmer and the third conversation took place on

---

10. Marcheselli's responses were somewhat ambiguous but he ultimately denied making the statement:

Q. Did you tell the same lies [concerning forthcoming harm to Farmer by third parties] to Mike Williams?
A. I may have.
Q. In fact, didn't you agree, "I did tell Mike Williams that Mike Farmer was not paying and I did tell Mike Williams the same lies I told Mike Farmer." Did you make that statement?
A. Yes, sir. I read a statement that you wanted me to sign.
Q. Did you not read it and say it was true?
A. As far as I remember, it could have been true. I am not sure.
Q. Did you not read a statement and agree to the truth of the statement, "I led Mike Williams to believe that there really was a man who was going to come down on Mike Farmer and on me.?"
A. No, sir.
Q. You did not read that?
A. No.
RT: 498–99.

11. See note 2 supra.

12. Farmer first testified that he thought Jenkins was not at this meeting and that Williams was present throughout the meeting. On cross-examination, however, Farmer, after refreshing his memory with a statement he had made to the F.B.I. a year earlier, testified that Jenkins was at the first meeting and that Williams left after the introduction was made.

New Year's Eve at a bar where Williams had been playing pool. Farmer initiated the conversation with Williams while it appears from the taped conversation that Williams was not interested in pursuing the subject.[13]

 In summary, Williams was at most a bit player with a minor role in the plot to extort money from Farmer. More importantly, the evidence that Williams had the requisite criminal intent was equivocal. Under these circumstances, the exclusion of the evidence takes on greater significance. Moreover, the court's error concerned the attempted impeachment of Marcheselli, the principal actor in the extortion scheme. Marcheselli's testimony as to Williams' actual role may well have been the factor that tipped the scale in the jury's determination that the proper reasonable inference from the evidence was that Williams was part of the extortion of Farmer. This court has repeatedly expressed its concern that defense counsel be given maximum opportunity to impeach the credibility of key government witnesses. *See Burr*, 618 F.2d at 587. Testing a witness' credibility is especially important when he is an accomplice of the accused. *See id.* Marcheselli's credibility was crucial and the jury was entitled to consider the impeachment evidence. *See Patterson v. McCarthy*, 581 F.2d 220, 221 (9th Cir. 1978).

We cannot say that restriction of the defense's impeachment of Marcheselli was harmless error and we therefore reverse his conviction.[14]

Because we are cognizant of the possibility of a new trial, we will address several other issues raised by Williams in order to provide guidance to the trial court.

EVIDENCE ADMITTED TO SHOW ATTEMPT TO COLLECT ADDITIONAL MONEY

 Williams argues that the trial judge improperly permitted hearsay evidence of Marcheselli's effort to obtain an additional $3,000 from Farmer. The trial judge ruled that because Williams had not withdrawn from the conspiracy the evidence was admissible. This is not the proper test for the admissibility of a co-conspirator's statement. A statement made "during the course and in furtherance of the conspiracy" is admissible. Fed.R.Evid. 801(d)(2)(E). It is the responsibility of the judge to make the initial determination whether the statement was made during and in furtherance of the conspiracy. *United States v. Eubanks*, 591 F.2d 513, 519 (9th Cir. 1979).[15] No such determination was made in this case; the judge never addressed this issue even though defense counsel brought it to the judge's attention.[16]

13. (Unrelated background conversation)
 FARMER: Michael? Mike? Wait a minute, I'll
 ⸱ ... We're gonna ... we're gonna talk a
 minute. Wait a minute. Huh?
 WILLIAMS: (Unintelligible)
 FARMER: Well, we're gonna talk a minute.
 Hello (Pause)
 FARMER: Vince isn't gonna talk for a couple
 more minutes. Might click it off. (Recorder turned off and on)
 WILLIAMS: Why should I do that?
 MARCHESELLI: Play pool.
 WILLIAMS: 'Cause I'm tired of playin' pool.
 FARMER: Hello, again. Come on, God damn
 it, I'll ...
 RT: 337–40.

14. Because we find prejudicial error, there is no need to address the duty of an appellate court when faced with a violation of the confrontation clause and the corresponding disharmony in this circuit surrounding that issue. *E.g., compare United States v. Brady*, 561 F.2d 1319, 1320 (9th Cir. 1977) *and United States v.*

*Ortega*, 561 F.2d 803, 806 (9th Cir. 1977) *with Chipman v. Mercer*, 628 F.2d 528, 533 (9th Cir. 1980). *Contra, United States v. Uramato*, 638 F.2d 84, 87 (9th Cir. 1980). *See also, United States v. Gambler*, 662 F.2d 834, at 840, n.6 (D.C.Cir.1981).

15. A proper foundation must establish that " '(1) the declaration was in furtherance of the conspiracy, (2) it was made during the pendency of the conspiracy, and (3) there is independent proof of the existence of the conspiracy and of the connection of the declarant and the defendant to it.' " *Eubanks*, 591 F.2d at 519 (quoting *United States v. Snow*, 521 F.2d 730, 733 (9th Cir. 1975), *cert. denied*, 423 U.S. 1090, 96 S.Ct. 883, 47 L.Ed.2d 101 (1976)).

16. The following colloquy took place outside the jury's hearing:
 THE COURT: Tell me again, Mr. Schwartz, exactly what your objection is.
 MR. SCHWARTZ: Your Honor, before an out-of-court declaration of Marcheselli can be

## MULTIPLE CONSPIRACY INSTRUCTION

■ Appellant contends that the trier of fact could have found that Marcheselli's attempt to obtain an additional $3,000 from Farmer was a conspiracy separate from the one alleged. We are told that the trial judge erred in his refusal to give Williams' requested instruction on multiple conspiracy to the jury. This claim is without merit. There can only be a conspiracy if, *inter alia*, there is an agreement between *two* or more persons. *United States v. Andreen*, 628 F.2d 1236, 1248 (9th Cir. 1980). Although a jury could have reasonably concluded from the evidence that Marcheselli's attempt at obtaining additional money from Farmer was an independent undertaking not related to the conspiracy charge, there was no evidence in this case that this was the result of an agreement between Marcheselli and someone else. The trial judge properly refused the jury instruction on multiple conspiracies.

> admitted, under Rule 801(d)(2), the statement must be in furtherance of the criminal conspiracy. If, as we heard from Mr. Farmer, the addition of the $3,000 was Marcheselli's separate venture, which was unknown to Mr. Jenkins, unknown to Mr. Williams and certainly not part of any agreement may [sic] have existed with regard to the original eight-for-five loan, then it is not in furtherance of the conspiracy and is not admissible under 801(a)(2).
> THE COURT: Based upon that objection, I will overrule it. I think it is. There is no indication that your client wished to, made any indication he was going to withdraw from the original conspiracy. I think the Ninth Circuit has been explicit on that. There must be some overt, definite indication on the part of the defendant, once he becomes a party to the conspiracy, to withdraw.
> MR. SCHWARTZ: Your Honor, it has nothing whatsoever to do with withdrawal. I am not talking about withdrawal. Any declaration, to be admissible, must be in furtherance of the conspiracy.
> The most that you have here in Mr. Farmer's testimony is that there was an agreement between Marcheselli and Jenkins to lend him five thousand dollars in return for payment of eight thousand dollars; that thereafter, Marcheselli unilaterally made the decision to raise that to require payment of eleven thousand dollars with the additional money going to him.

## THE PRESENTENCE REPORT

The final issue raised by Williams involves Williams' presentence report. The presentence report indicated that Williams had been convicted of first degree assault in 1974. The report included details of the assault and suggested that Williams had been under contract to murder the victims. The report also noted that Williams' conviction had been overturned by the Washington Court of Appeals, but that "the only basis" for the reversal was a violation of Williams' right to a speedy trial.[17]

At the time of sentencing, the court was advised that the presentence report inaccurately presented the basis for the reversal of the assault conviction and that the facts set forth in the report concerning the alleged assault should not be viewed as proved. The trial court was asked to continue the sentencing so that the state court records could be obtained to rebut the accuracy of the report. The trial judge refused to do so.[18] Williams was sentenced to five

> If he did that without authorization or even knowledge of Jenkins, strictly on his own hook—
> THE COURT: I know nothing under the cases that involve conspiracy that supports your position. Nothing. Motion is denied.
> MR. SCHWARTZ: Your Honor, once again, if the Court says you know nothing of the cases, one of the reasons I said this morning, the appropriate thing for me to do is get a continuance. Let me brief it and give it to you.
> THE COURT: There isn't anything. All the briefing in the world isn't going to change it.
> . . . .
> RT: 2–4.

17. The report made the following statements: "A review of the petition for appeal revealed that the defendant's right to a speedy trial was the only issue. No argument regarding the presentation of factual evidence was noted."

18. MR. SCHWARTZ: Well if the court wants to go into the facts of that case [the 1974 first degree assault case], then I would ask that this proceeding be set over for two weeks, and that the court order the transcript, because there is an awful lot that occurred at that trial in terms of the testimony that is not reflected in the presentence report.

years imprisonment on Counts I and VI, to run concurrently, and was given a suspended three-year sentence on Count X and placed on probation for three years.

 Judges are given very broad discretion to consider a wide range of information in arriving at the sentencing decision. *United States v. Tucker*, 404 U.S. 443, 446, 92 S.Ct. 589, 591, 30 L.Ed.2d 592 (1972); *United States v. Larios*, 640 F.2d 938, 942 (9th Cir. 1981). Information concerning criminal conduct that has not resulted in a conviction may be considered. *United States v. Morgan*, 595 F.2d 1134, 1136–37 (9th Cir. 1979). Where, however, the trial judge relies on materially false or unreliable information, there is a violation of defendant's due process rights. *Townsend v. Burke*, 334 U.S. 736, 740–41, 68 S.Ct. 1252, 1255, 92 L.Ed. 1690 (1948); *United States v. Lasky*, 592 F.2d 560, 562 (9th Cir. 1979). The trial judge in the matter *sub judice* expressly relied upon statements in the pre-

sentence report that Williams was guilty of a vicious assault upon two people and had a contract to murder them. The judge took the facts as proved and not disputed in the appeal to the state court.[19] This reliance was misplaced because the report did not accurately state the circumstances of the reversal of Williams' conviction; eight issues were raised on appeal including failure to establish a *prima facie* case.[20] The state court reversed the conviction solely as to the speedy trial issue because disposition of that issue made it "unnecessary to discuss defendant's remaining assignments of error." *State v. Williams*, 14 Wash.App. 803, 545 P.2d 572, 575, *aff'd*, 87 Wash.2d 916, 557 P.2d 1311 (1976). The trial judge in this case thus abused his discretion in: (1) denying Williams' request for a continuance to present evidence that the statements concerning the 1974 assault in the report were inaccurate and unreliable, and; (2) in relying on these statements as true.[21]

THE COURT: Well I am sure, Mr. Schwartz, *that I am not going to set over any-thing. . . .*
Sentence Transcript at 11.

19. THE COURT: And it shows, sir, that apparently you were convicted of two counts of first degree assault of a Naselle, Washington couple, and some of your acquaintances apparently believed that you were on a contract for murder; is that correct, sir?
MR. WILLIAMS: No, sir.
THE COURT: Well it seems though the license number of your van was identified, there was a jacket found covered with some blood and some tools, and a detailed map of the location and area surrounding the victims' residence, and you were convicted, which was later set aside because you didn't get a speedy trial. And Mr. Schwartz, for the record, I am considering the facts of the case in considering your client in sentencing in this matter, and I am not considering the conviction, because there isn't any. I think I am entitled to know something about your client.
. . . . . .
THE COURT: Well it was dismissed, but the facts stay forever, don't they?
Sentence Transcript at 11–13.

20. The following issues were raised on appeal:
Argument of Appellant
A. The Court should have Granted Appellant's Motion to Dismiss for Delay in Prosecution

B. Waiver to be Effective Must be Done Knowingly, Intentionally and Voluntarily
C. The Trial Court Erred in Denying Appellant's Motion to Dismiss for the State's Failure to Establish a Prima Facie Case of First Degree Assault
D. It was Error in this Case for the Wrench (plaintiff's Ex. # 2) to be Admitted for Illustrative Purposes
E. The Trial Court Should Have Granted Appellant's Motion to Suppress the Evidence of the Wrench Since the Wrench was Obtained Through an Improper Search
F. The Trial Court Erred in Denying Appellant's Motion to Dismiss the Case on the Ground that Certain Information had not Been Supplied by the Prosecutor in a Timely Manner
G. It was Error for the Court to Deny Appellant's Repeated Motions to Dismiss Because of the Prosecutor's Misconduct
H. It was Error for the Court to Deny Appellant's Motion for a Change of Venue
Brief of appellant at i-ii, *State v. Williams*, 14 Wash.App. 803, 545 P.2d 572, *aff'd*, 87 Wash.2d 916, 557 P.2d 1311 (1976).

21. The government points out that "due process does not require an evidentiary hearing to establish the veracity of all information in a presentence report before it may be considered by the sentencing judge." *Farrow v. United States*, 580 F.2d 1339, 1360 (9th Cir. 1978) (en banc). The court in *Farrow*, however, was referring to hearsay evidence and had the de-

CONCLUSION

The conviction of Michael Dean Williams is reversed and remanded. In the event that there is a new trial, the case is to be reassigned to a new judge to preserve the appearance of justice. *See Larios,* 640 F.2d at 943–44; *United States v. Doe,* 655 F.2d 920, 929 (9th Cir. 1980); *United States v. Ferguson,* 624 F.2d 81, 83–84 (9th Cir. 1980).

fendant's version of the facts presented both in the presentence report and by his counsel at sentencing. *Id.* at 1359. The sentencing judge was thus apprised of both versions of the facts and "there is every reason to believe that the sentencing judge, presented with conflicting factual accounts, maintained a healthy skepticism." *Id.* In contrast, in the case before us the presentence report presented only one version of the facts of the assault and presented those facts as conclusively proved. Although Williams challenged the accuracy of the report at sentencing, the judge expressly stated that he would rely on the facts as presented in the report.