No. 19,544.

HAROLD DAVID WOOLEY *v.* THE PEOPLE OF THE
STATE OF COLORADO.
(367 P. [2d] 903)

Decided November 20, 1961.   Rehearing denied January 29, 1962.

Mr. Felix Lepore, for plaintiff in error.

Mr. Duke W. Dunbar, Attorney General, Mr. Frank E. Hickey, Deputy, Mr. J. F. Brauer, Assistant, for defendant in error.

*En Banc.*

Mr. Justice McWilliams delivered the opinion of the Court.

Harold David Wooley and Mary Pearl Wooley, who is referred to as his common law wife, were jointly charged by direct information with the murder of William Scott Wright. Upon motion the trial court ordered separate trials, and we are here concerned with only the one defendant, Harold David Wooley, who will hereafter be referred to as Wooley.

When arraigned Wooley pleaded "not guilty" and "not

guilty by reason of insanity at the time of the alleged commission of the crime." Pursuant to applicable statute (C.R.S. '53, 39-8-2) he was then transferred to the State Hospital for mental examination. Subsequent to this examination the trial court, upon Wooley's request, also appointed Dr. J. T. Hilton to examine him.

As permitted by C.R.S. '53, 39-8-3 (Supp.), the trial court ordered "one trial upon all issues raised by all pleas entered." By appropriate verdicts the jury determined that Wooley was sane, adjudged him guilty of murder in the first degree, and fixed his punishment at death. Motion for new trial was duly filed, argued and denied and by writ of error Wooley seeks reversal of the judgment and sentence to death entered by the trial court.

A brief resume of the evidence adduced upon trial is deemed necessary in order that the various assignments of error may be better understood.

At the outset it should be noted that the People's theory of the case was that this was a cold-blooded, deliberate, premeditated killing for financial profit, as opposed to the defendant's theory that although he shot and killed Wright, he did so accidentally, and in any event was insane.

The Wooleys first met Wright in September, 1958, in a bar on East Colfax Avenue in Denver, where Mrs. Wooley was employed as a waitress. Mr. Wooley at the time worked for his father in the latter's upholstery shop, and Wright, who was 37 and a college graduate, had no employment nor profession, but had inherited certain income-producing, commercial properties from his adoptive mother. Through the succeeding months these three became fairly well acquainted, generally meeting by chance in various bars or coffee shops on East Colfax. On June 12, 1959, the three again met and over a sociable drink Wooley told how difficult his father was and the irritating problems he experienced in working for his father. Wright suggested that the three of

them go to his mountain cabin in the Indian Hills area for a few days vacation and that the rest would do them all good. This suggestion was acceptable to all, and accordingly the following day, June 13, 1959, the Wooleys and Wright drove in the latter's 1956 Thunderbird to his mountain cabin.

On Monday, June 15, 1959, the three of them briefly returned to Denver to get supplies, at which time they went to Wright's place of residence. It was established that Wright got a Herrington and Richardson revolver from his home and placed it in the glove compartment of his car, with the comment that they would do some target shooting in the mountains. En route back to the cabin they stopped in Evergreen where the Wooleys bought shells for the revolver. They then proceeded to return to their mountain retreat.

No untoward incident of any type occurred at the cabin until June 16, 1959, when at or about 8 o'clock A.M. Wooley shot and killed Wright as the latter lay sleeping on a cot in the living room of the cabin. Prior thereto, their time had been primarily spent in eating, sleeping, interlaced with considerable imbibing of alcoholic beverages.

Wooley and his wife slept in the only bedroom in the cabin, and Wright, as mentioned, slept on a cot in the living room. After determining that Wright was dead, the Wooley's wrapped him in a bed sheet and then with baling wire securely tied a canvas covering around the body. They then stuffed his body in the trunk of his Thunderbird and drove some 30 miles to the Clear Creek Canyon area where they dumped his body in an isolated sector and covered it with rocks. Returning to the cabin, the first thing that Wooley did was to extract $16 from Wright's billfold and he then burned all of Wright's identification papers, and otherwise disposed of his personal effects.

The Wooleys soon left the cabin and returned to their Denver home, continuing to use Wright's Thunderbird.

Needless to relate, the Wooleys did not report the matter to any law enforcement agency. Rather for the next three months, in Mrs. Wooley's own words, they tried to "cover up" and provide themselves with what she described as an "alibi." To that end they told those who inquired that Wright had gone to New Mexico where he intended to marry and that he had left his Thunderbird with them. When in due time he did not return they expressed "alarm" to their associates. They even sent a registered letter to Wright, directed to Hobbs, New Mexico, which needless to say was returned because of the inability of the postoffice to locate the addressee. The Wooleys also made an actual trip to New Mexico "looking for" Wright, and while on this trip sold the death weapon.

The Wooleys also began to take care of Wright's place of residence, watering the lawn and putting the papers in, and the like. They were able to gain entry to the house by using a key found on the automobile key-ring. In checking Wright's mail they found certain checks made out to Wright, representing rentals due on commercial properties. By devious methods the Wooleys managed to cash five of these checks, receiving therefor a total of $1,400.

Early in September 1959 the Wooleys were questioned by investigators of the District Attorney's office, who were checking complaints made to them in connection with the five checks cashed by the Wooleys. When questioned the Wooleys claimed that they had permission and authority from Wright to cash these checks, and stated that the last they saw of Wright he was in excellent spirits and was going to New Mexico with the intent to get married.

About one week later, officers of the Denver Police Department, who by this time were investigating the disappearance of Wright, began to question Wooley. Earlier in August, the Wooleys had voluntarily gone to the Missing Persons Bureau of the police department

and gratuituously advised them not to become alarmed if someone should perchance report Wright as missing. They said that Wright frequently went on long trips by himself. When first questioned by the police Wooley gave them the same story he had related to the district attorney and others, namely, that all he knew was that Wright went to New Mexico to get married, and volunteered that he fully expected Wright to "walk through the front door" any minute.

This is where matters stood when Wright's badly decomposed body was found on September 15, 1959, in the Clear Creek Canyon area, where it had some three months before been left by the Wooleys. There was no recognizable or identifiable facial tissue on the corpse and identification was subsequently made by an examination of the teeth. Wright's dentist compared his dental records with the teeth of the corpse and positively identified the body as that of Wright. The coroner who conducted an autopsy on the body testified that the cause of death was a "bullet wound through the head," entrance being on the "right region of the temple" and the exit "on the left side over the left ear." The examinations made by both the dentist and the coroner were conducted in a morgue and a photograph was taken of the body as it lay in the morgue.

When Wooley was confronted by the police with the fact that Wright's body had been discovered, he "broke" and confessed the killing. On September 17, 1959, Wooley made a written confession in which he admitted that he intentionally shot and killed Wright as the latter lay sleeping. He offered no motive for the killing.

It having then been determined the homicide was committed in Jefferson County, Wooley was turned over to the Jefferson County authorities. They understandably questioned him further about the shooting and the upshot of their interrogation was that Wooley voluntarily agreed to go to the cabin and show just exactly what happened with an "on the scene" demonstration.

This he did, giving specific and detailed information as to the precise location of the cot on which Wright was sleeping, his exact location when he fired the one shot which entered the right side of Wright's head. As a part of this demonstration Wooley was given a revolver and asked to illustrate the manner in which he held the gun. This he did and a photograph was taken for the purpose of preserving in pictorial form Wooley's demonstration as to just how and in what manner he shot Wright. This decision to take a photograph of the manner in which Wooley shot Wright bordered on the clairvoyant, because by the time of trial it was Wooley's contention that besides being insane he "accidentally" killed Wright, but not "intentionally."

Wooley elected not to exercise his right to testify at his trial, but Mrs. Wooley was called by the defendant and testified in substance that she and the defendant were intending to do some early morning target shooting and that when Wooley took hold of the revolver it "just went off." In explaining why this accident was not promptly reported to the proper authorities she said that Wooley "had been in trouble" and that the police would never believe their story.

In connection with the insanity plea, Dr. Hilton testified that he found Wooley insane. In rebuttal, Dr. Waggoner testified that he examined Wooley at the State Hospital and found Wooley to be sane. Dr. Rymer testified that he examined Wooley in the Jefferson County Jail at the request of the District Attorney shortly after Wooley was transferred to the Jefferson County Jail from Denver, and that he too believed Wooley to be legally sane.

Wooley suggests that the trial court committed error in some fifteen different ways. Careful examination of the voluminous record convinces us that all assignments of alleged error are without merit, though several deserve comment.

Wooley contends that the trial court committed error

in receiving in evidence over his objection certain photographs, particularly that of Wright's decomposed body as it lay in the morgue on September 17, 1959, and that of Wooley taken in Wright's cabin when he demonstrated the manner in which he held the gun as he shot Wright.

Photographs are not inadmissible simply because they are photographs. Nor are they rendered inadmissible because they depict a scene which offends the senses or perhaps arouses the emotion. Frequently, pictorial evidence really does tell more than a thousand words. The test of admissibility as to proffered evidence is the same whether it be pictorial or testimonial: is it competent, material and relevant to the issues of the case?

A body believed to be that of Wright was located in the Clear Creek Canyon area on September 15, 1959, in the late afternoon in a badly decomposed state under a huge pile of rocks. This body was soon removed to a morgue. In this morgue Wright's dentist examined the body, and after comparing his dental records of Wright's teeth with the teeth of the corpse, positively identified the body as that of Wright. Also, on the same day a coroner conducted an autopsy on the body to determine the exact cause of death. He verbally described the bullet wound in the head. A photograph was taken of the body as it lay in the morgue, and over objection this photograph (People's exhibit 2G) was received in evidence. This photograph essentially depicted the bullet wound in the head, though other parts of the body were necessarily included in the picture. In *Potts v. People,* 114 Colo. 253, 158 P. (2d) 739, we said: "Ordinarily photographs are competent evidence of anything which it is competent for a witness to describe in words. They are not inadmissible merely because they bring vividly to the jurors the details of a shocking crime or tend to arouse passion or prejudice." See also, *Martinez v. People,* 124 Colo. 170, 235 P. (2d) 810. Wooley relies

on *Archina v. People,* 135 Colo. 8, 307 P. (2d) 1083, where it was held to be error to admit in evidence a photograph of a body in a morgue with the comment that the particular picture tended to "prove the handiwork of surgeons who, in their efforts to save her life, had largely covered up evidence of the handiwork of the defendant." In the instant case People's exhibit 2G portrays only the "handiwork" of Wooley and in the following particulars: (1) the gunshot wound in the head inflicted by Wooley; (2) decomposition of tissue resulting from the fact Wooley dumped the body in an isolated area and abandoned it to the ravaging effect of nature and time.

Similarly, in connection with the photograph of Wooley demonstrating the manner in which he shot Wright, there is no suggestion that an eyewitness thereto could not verbally relate what he saw Wooley do in his demonstration. But it is contended that a photograph of Wooley as he demonstrated exactly how he held the gun at the fateful moment is inadmissible. Such is most illogical. The photograph not only corroborates but also gives meaning to the verbal account of Wooley's demonstration. In view of Wooley's theory of defense upon trial, this particular photograph assumed even greater materiality and importance. At trial Mrs. Wooley testified in effect that the gun fired "accidentally," whereas this photograph indicated an intentional act. There was no error in receiving either of these photographs in evidence.

It is next urged that the trial court erred in permitting the People to introduce, over objection, evidence concerning the cashing by the Wooleys of the five checks, which subsequent to Wright's death had been delivered by mail to his residence. These checks represented monies due Wright for rentals on certain of his commercial properties. In each instance the Wooleys, acting without authority, opened the particular envelope and

by devious means, including forgery, succeeded in cashing the checks and realized therefrom $1,400. The Wooleys contend that this was proof of the commission of an unrelated crime and was, therefore, inadmissible; but that if it be deemed admissible then the trial court erred in failing to follow the procedures approved in *Stull v. People,* 140 Colo. 278, 344 P. (2d) 455. The People argue that this is not a situation where evidence which shows the commission of a *similar* but independent offense is offered for the purpose of proving intent, plan or scheme, but rather it is a situation where the People were merely attempting to show Wooley's motive for the killing, and the fact that such evidence shows the commission of another, but completely *dissimilar,* offense does not render it inadmissible. It should be noted that the *Stull* case involved "other transactions" of a "similar nature" which were "wholly independent" of the offense for which the defendant was on trial. Whereas in the instant case, we are concerned with other transactions of a dissimilar nature which instead of being "wholly independent" of the offense for which Wooley was on trial were on the contrary an integral part and parcel of the total picture surrounding the homicide.

In the prosecution of a homicide the People are under no obligation to show a motive for the commission of the crime, but evidence tending to show the existence of such motive has long been held admissible. See 40 C.J.S. page 1151, Homicide, §227; and *Brown v. People,* 130 Colo. 77, 273 P. (2d) 128. It was the People's theory of the case that because of their close friendship Wooley knew that Wright was well-to-do, and with this knowledge killed Wright for financial profit and that the evidence relating to these checks was therefore material and relevant. The People had the undoubted right to show that very shortly after the killing Wooley extracted $16 from Wright's billfold. Similarly, evidence that a few weeks later Wooley cashed checks made payable to

Wright and pocketed the proceeds is of the same type and character, the time interval not warranting exclusion of the evidence.

In 40 C.J.S. page 1154, Homicide, §227 appears the following: "Evidence which has a direct tendency in view of surrounding circumstances to establish motive is admissible against the accused, even though it may show him guilty of crimes other than that for which he is on trial."

There was no error in permitting the People to introduce evidence pertaining to the cashing of the checks by Wooley. The evidence had obvious probative value in explaining the motive for this killing. In its instructions the trial court out of an abundance of caution advised the jury as to the purpose for which this evidence had been received and cautioned the jury that Wooley was on trial only for the offense charged in the information.

■ Wooley also assigns as error the fact that the trial court over his objection received in evidence the written confession made by him to the witness Childers, then captain of detectives of the Denver Police department. In this "confession" as a preliminary question he was asked when he began to live with Mary Pearl Wooley. He voluntarily responded as follows: "About a year and three months — four months. Right after I got out of Canon." Wooley contends that this answer conveys to the jury the definite idea that he had served time in the state penitentiary, in Canon City, and that this answer rendered the entire confession inadmissible, or if not entirely inadmissible, then the particular answer should have been erased, expunged or in some manner eradicated. This same problem was considered in *McRae v. People*, 131 Colo. 305, 281 P. (2d) 153, where it was said: "We characterize the statement of defendant relative to his incarceration in Canon City *as voluntarily injected in his answer without suggestion thereof by the officers*

*who were interrogating him."* (Emphasis supplied.) It should be noted that the question propounded by Captain Childers was perfectly proper and not calculated to elicit the type of response spontaneously uttered by Wooley. Any possible adverse effect of this response was rendered negligible when it is recalled that Wooley's excuse for failing to report the "accident" to the police was that he "had been in trouble" and therefore the police wouldn't believe him. No error was committed in receiving the confession in its entirety.

In connection with his insanity plea Wooley contends that the trial court erred in three respects: (1) in refusing to order the district attorney to deliver Wooley's confession to Dr. Hilton to be used by him in conducting his mental examination of Wooley; (2) in permitting Dr. Rymer to testify for the People in rebuttal, it being shown that Dr. Rymer examined Wooley in the Jefferson County jail *before* arraignment; and (3) in precluding Wooley from cross-examining Dr. Waggoner as to the contents of a report prepared by a psychologist who had examined Wooley at the State Hospital.

Subsequent to the trial of the instant case, points 2 and 3, as enumerated above, have been considered by this Court in *Early v. People,* 142 Colo. 462, 352 P. (2d) 112 and *Hammil v. People,* 145 Colo. 577, 361 P. (2d) 117. In each instance the contention here advanced by Wooley was rejected, hence there was no error in either of these rulings of the trial court.

Wooley cites C.R.S. '53, 39-8-2 as authority for his demand that the district attorney turn over to Dr. Hilton a copy of his confession. Careful reading of this statute discloses that it is inapplicable and no authority whatsoever for the proposition here advanced.

To comment upon all the other matters urged by Wooley would unduly prolong this opinion with no good purpose being served. We have painstakingly reviewed the record and have carefully considered all assignments

of error. We perceive no error which would justify or require a reversal.

The judgment is therefore affirmed and it is ordered that the same be executed during the week beginning at midnight, March 3, 1962.

MR. JUSTICE PRINGLE not participating.