### No. C-1380

### Vern Hudson v. The People of the State of Colorado

(585 P.2d 580)

Decided August 21, 1978.                    Rehearing denied September 18, 1978.

212

Rollie R. Rogers, State Public Defender, James F. Dumas, Jr., Chief Deputy, Cary C. Lacklen, Deputy, Bryan D. Shaha, Deputy, for petitioner.

J. D. MacFarlane, Attorney General, David W. Robbins, Deputy, Edward G. Donovan, Solicitor General, Linda Palmieri Rigsby, Assistant, for respondent.

*En Banc.*

MR. JUSTICE CARRIGAN delivered the opinion of the Court.

The petitioner Hudson was convicted by a jury of attempting to dispense a dangerous drug,[1] and the court of appeals affirmed the conviction. *People v. Hudson,* 39 Colo. App. 442, 570 P.2d 839 (1977). We granted certiorari, and now affirm the judgment of the court of appeals.

On August 27, 1975, the petitioner was arrested on a charge of theft by receiving. After being taken to the Weld County Jail, he was searched and his personal effects were inventoried and locked in a filing cabinet. Still in his civilian clothes, he spent the night in a holding cell.

The next morning, the petitioner was formally processed, and at that time he was given jail clothing. His civilian clothes were taken from him and placed in a brown paper sack with his name on it. The bag was stapled shut and put into a bin in the jail's clothing room.

On August 28, the petitioner shared a cell with one Donald Wilson, who later became a prosecution witness at the petitioner's trial. Wilson testified that the petitioner had inquired whether it was possible to gain access to the clothing room, to which Wilson had replied in the affirmative. According to Wilson, the petitioner then asked if Wilson was familiar with the name "Whitehorse." Wilson responded that he knew of Whitehorse's reputation as having "some of the best dope in town." At that point, according to Wilson, the petitioner identified himself as Whitehorse and told Wilson that he would give him half of the drugs he had hidden in his civilian clothes if Wilson would retrieve them from the clothing room.

Shortly thereafter, Wilson informed a police officer that the petitioner had drugs hidden in his clothing which had already been

---

[1] Section 12-22-404(1)(a), C.R.S. 1973, and section 18-2-101, C.R.S. 1973.

inventoried. At least two hours later, and after several unsuccessful 'attempts to locate the petitioner's clothes, jail officers found them, searched them without a warrant, and discovered a small bag of methamphetamine concealed in the trousers waistband. On the basis of Wilson's testimony and the methamphetamine thus discovered, the petitioner was convicted of attempting to dispense a dangerous drug.

## I. *Warrantless Search and Seizure*

The petitioner first contends that the circumstances did not justify a warrantless search of his clothing, which had been placed in protective custody in the jail's clothing room. On the basis of the evidence presented in this particular case, we disagree.

We have previously held that prisoners' expectations of privacy are greatly diminished, and that *reasonable* intrusions by prison officials with a justifiable purpose of preserving prison order or security do not violate the Fourth Amendment simply because they are conducted without a warrant. *Larkin v. People,* 177 Colo. 156, 493 P.2d 1 (1972); *Moore v. People,* 171 Colo. 338, 467 P.2d 50 (1970). As we observed in *Moore,* searches conducted by officials charged with the orderly administration of state prisons are not unreasonable as long as they are not conducted in a cruel or unusual manner or for the purpose of harassing or humiliating the inmate. 171 Colo. at 342, 467 P.2d at 52.

The petitioner argues, however, that the above-cited cases are not controlling here. First, he correctly points out that both cases concerned searches of state penitentiary inmates who already had been convicted of crimes, while he was detained in jail for trial of pending charges.

In our view, however, the distinction is without a difference, for the rationale which we have recognized as controlling is that of preserving order and security in places of incarceration. This rationale applies no less forcefully to pre-trial detention facilities such as county jails than to facilities where convicted criminals serve sentences. Most county jails, as in this instance, hold prisoners of both categories. The weighty governmental interest in maintaining security is present regardless of the particular prisoner's status. *See United States v. Hearst,* 563 F.2d 1331 (9th Cir. 1977).

Second, the petitioner contends that *Moore v. People, supra,* is distinguishable because it involved the search of an inmate's *cell,* while the instant case involved the search of the petitioner's clothing in the jail property room. The petitioner concedes that this distinction would have little force if the clothing room were in fact accessible to the prisoners, but he argues that the evidence in the record does not support the trial court's conclusion that prisoners could in fact get into that room, and therefore prison security and order were at stake.

Although there was some conflict in the evidence, there was testimony indicating several means — some with guard permission — by

which prisoners could gain access to the clothing room, and further indicating that jail security was limited, to say the least.[2]  This evidence was sufficient to sustain the trial court's finding that prison security was threatened, and we will not disturb that finding on review.

In summary, since the jail officers had direct information that the petitioner claimed to have drugs in his civilian clothes, and that he was attempting to gain access to those drugs, the officers had reasonable grounds to justify searching the clothes. Moreover, where jail conditions were such that there was a real possibility that someone could gain access to the drugs, there was a sufficiently immediate threat to jail order and security to justify a warrantless search. Therefore the requirements of *Moore v. People, supra,* were met, and the search did not violate the petitioner's constitutional rights.

## II.  *Evidence of Other Criminal Transactions*

The petitioner also argues that the trial court erroneously permitted Wilson to testify regarding his conversation with the petitioner, in which he stated his knowledge that "Whitehorse" had "some of the best dope in town." He contends that the testimony related to criminal acts separate and distinct from the crime for which he was on trial, was highly prejudicial, and therefore was inadmissible. We do not agree.

Subject to certain exceptions, evidence of "wholly independent" criminal acts committed by a defendant is generally inadmissible to prove his guilt of the crime charged. *E.g., People v. Geller,* 189 Colo. 338, 540 P.2d 334 (1975). In this case, however, the challenged testimony simply related the conversation which constituted part of the petitioner's attempt to procure and dispense the drugs in his clothing. Wilson's statement did not actually relate any other specific criminal transactions. In any event the statement in question was the means chosen by the petitioner to identify himself to Wilson as a known drug supplier. This identification by reputation was inextricably interwoven with the other evidence showing that the petitioner knew his clothing concealed contraband narcotics. As such it was directly connected to the chain of events leading to the criminal act charged in the information. Therefore, even though the testimony may have suggested the petitioner's involvement in other criminal activity, it was admissible under the circumstances here presented. *People v. Geller, supra. See also People v. Manier,* 184 Colo. 44, 518 P.2d 811 (1974).

Accordingly, the judgment of the court of appeals is affirmed.

---

[2] For example, one deputy testified that on the night in question the jail held about forty inmates, but only two guards — one of them a trainee — were on duty. He further testified that most of the medium security cell doors could not be locked, and that the door to the clothing room was warped to the point that it could not even be closed, let alone locked.