Robert WILLIAMS, Petitioner,

v.

The PEOPLE of the State of
Colorado, Respondent.

No. 84SC300.

Supreme Court of Colorado,
En Banc.

Aug. 25, 1986.

Rehearing Denied Sept. 29, 1986.

Haddon, Morgan & Foreman, Norman R. Mueller, Denver, for petitioner.

Robert R. Gallagher, Jr., Dist. Atty., Catherine P. Adkisson, Chief Deputy Dist. Atty., Bruce H. Rabun, Deputy Dist. Atty., Littleton, for respondent.

KIRSHBAUM, Justice.

We granted certiorari to review the Court of Appeals' unpublished opinion in *People v. Williams*, 82CA0056, affirming the jury conviction of the defendant, Robert Williams, of first degree murder,[1] conspiracy to commit murder in the first de-

1. Section 18–3–102, 8 C.R.S. (1978).

2. Section 18–2–201, 8 C.R.S. (1978).

3. Section 18–8–105, 8 C.R.S. (1978).

gree,[2] and accessory to the crime of murder.[3] We affirm.

The evidence at trial established that in the summer and fall of 1980 the defendant, his girlfriend, Valerie Shaughnessy, Steven Lloyd and the victim actively participated in the illegal purchase, sale and use of narcotic and dangerous drugs. On August 28, 1980, Lloyd was arrested on drug-related charges and placed in the Denver County Jail as the result of a search of his apartment by law enforcement agents. The defendant, who was present during that search, consented to a search of his own residence and, as a result, was also arrested and placed in the Denver County Jail. During their incarceration, Lloyd and the defendant discussed the possibility that someone, perhaps the victim, had informed on them.

On September 12, 1980, the victim was found stabbed to death in Daniels Park, Douglas County, Colorado. When first questioned by law enforcement officials, the defendant, Shaughnessy and Lloyd all stated that the three of them had gone to a movie during the evening of September 11, 1980, and that they had seen the victim before they went to the movie. On October 16 and 17, 1980, however, Shaughnessy made two somewhat inconsistent statements, one oral and one written, to Colorado Bureau of Investigation (CBI) agents. She at that time repudiated her earlier versions of the events of September 11, suggested that in fact Lloyd and the defendant had taken the victim to Daniels Park to acquire drugs during the evening of September 11 and stated that although she did not know what happened at the park, she surmised that someone other than Lloyd or the defendant had killed the victim.

On October 31, 1980, the defendant was arrested and jailed in Phoenix, Arizona, for the murder of the victim.[4] On November

4. The defendant was charged with first degree murder after deliberation, first degree felony murder, and conspiracy to commit murder. The defendant's theory of the case instruction added the accessory to the crime of murder charge.

6, 1980, while in jail, he wrote a letter to Lloyd concerning the events of September 11, 1980. That letter indicated that Shaughnessy had stabbed the victim as the result of an argument at Daniels Park and that the defendant and Lloyd had tried to stop her. On November 17, 1980, Lloyd told that version of the events to two CBI agents. However, Lloyd later wrote a letter to the CBI stating that the story he told on November 17 was false; that the defendant, Shaughnessy and Lloyd planned the murder during the day on September 11; and that only Shaughnessy and the defendant actually stabbed the victim that night.

Shaughnessy and Lloyd were subsequently arrested and charged with first degree murder and conspiracy to commit murder. Lloyd agreed to testify for the prosecution at the defendant's trial and in return was permitted to plead guilty to second degree murder. The trials of Shaughnessy and of the defendant were severed. Shaughnessy did not testify at the defendant's trial and ultimately entered a plea of guilty to second degree murder. The two statements given by Shaughnessy to CBI agents describing the events of September 11, 1980, and a third statement she had made to the defendant's attorney were admitted into evidence during the defendant's trial.

At the defendant's trial, Lloyd testified that on September 11, 1980, the defendant called him up and asked him to come over to the defendant's house; that when Lloyd complied, the defendant outlined a plan to kill the victim, who was due to arrive shortly; and that the plan included participation by the defendant, Shaughnessy and Lloyd. Lloyd also testified that this plan was abandoned upon the victim's arrival and that the victim then accompanied the defendant, Shaughnessy and Lloyd to Daniels Park in the belief that some drugs were to be delivered at that location. Lloyd further testified that when they reached the park he grabbed the victim from behind; that Shaughnessy began to stab the victim and accidentally stabbed the defendant in the arm and Lloyd in the finger; that she be-

came frustrated that the victim would not die and gave the knife to the defendant; that the defendant proceeded to stab the victim; and that the three finally dragged the victim into the woods and returned home. Lloyd testified that on the way home they fabricated an alibi that included the assertion that the defendant cut his arm on a fence when the three attempted to sneak into a drive-in theater.

The defendant testified at his trial that no plan existed to kill the victim, that the group of four went to Daniels Park to drink beer and smoke marijuana, that the victim threatened Shaughnessy that he would tell the defendant about a prior sexual relationship between the victim and Shaughnessy, and that in a fit of anger Shaughnessy began stabbing the victim while the defendant and Lloyd attempted to restrain her. The defendant then testified that he and Lloyd stopped Shaughnessy, at which point the victim was still alive, but that Lloyd then began stabbing the victim.

In her October 17, 1980, written statement to the CBI, Shaughnessy stated that on September 11, 1980, the victim visited the house she and the defendant shared; that Lloyd was already there; that the three men left to obtain some drugs; that Lloyd and the defendant returned later that evening without the victim; and that when Shaughnessy asked the defendant about a visible cut on his arm, he replied that he had cut it while climbing a fence. In her November 14, 1980, statement to John Dicke, the defendant's then attorney, Shaughnessy stated that she was present at Daniels Park with the other three on the evening of September 11, 1980, and that she stabbed the victim in the heat of an argument. This statement was consistent with the version of the events discussed in the defendant's November 6, 1980, letter to Lloyd and in a March 7, 1981, letter from the defendant to Shaughnessy. The jury entered verdicts of guilty to the charged offenses of first degree murder and conspiracy to commit murder and also to a lesser non-included offense of accessory to murder.

On appeal, the defendant asserted numerous evidentiary errors, each of which the Court of Appeals rejected. We granted certiorari on the following issues: whether the trial court erred in admitting into evidence two statements of Lloyd containing references to the defendant's prior criminal conduct; whether the trial court erred in admitting Lloyd's testimony as to the defendant's prior criminal activity; whether the trial court erred in admitting hearsay statements of Shaughnessy; and whether the cumulative effect of the above errors denied the defendant a fair trial.

## I

The defendant argues that the trial court erroneously admitted two statements of Lloyd that referred to other criminal activity by the defendant. We disagree.

The defendant first challenges the admission of Lloyd's November 18, 1980, letter to the CBI (Exhibit KK), in which Lloyd admitted that a statement he had made the previous day was false and that he was now telling the truth. The defendant objected to the introduction of Exhibit KK during Lloyd's direct testimony on the ground that it was consistent with Lloyd's trial testimony. The prosecution argued that the letter was admissible as an admission against Lloyd's penal interest.[5] The trial court found that the exhibit was admissible because it was corroborative of Lloyd's testimony and because Lloyd was available for cross-examination to protect the defendant's confrontation right. On appeal, the People concede that the admission of the exhibit was error, but argue that the error was harmless.

▬ Exhibit KK is an out-of-court statement introduced for the truth of the matter asserted therein. It, therefore, is hearsay as defined by CRE 801(c). CRE

801(d)(1)(B) provides that certain prior statements made by a witness are not hearsay if:

> [t]he declarant testifies at the trial or hearing and is subject to cross-examination concerning the statement, and the statement is ... consistent with his testimony and is offered to rebut an express or implied charge against him of recent fabrication or improper influence or motive....

Although Exhibit KK was essentially consistent with Lloyd's trial testimony, it was introduced by the prosecution during Lloyd's direct testimony and was not offered to rebut any charge against Lloyd of recent fabrication or improper influence or motive. The letter does not constitute an exception under CRE 801(d)(1)(B), and the trial court erred in admitting it.

▬ Crim.P. 52(a) provides that any error not affecting substantial rights of the defendant shall be disregarded on appeal. Exhibit KK was a pencil-written, six-page letter purportedly setting forth the events of the night of the murder. Although basically consistent with Lloyd's trial testimony in that it placed the responsibility for the victim's death on the defendant and Shaughnessy, the letter differed in some details from that testimony and, therefore, did not greatly enhance Lloyd's credibility. In these circumstances, we do not find the admission of the letter to have been prejudicial to the defendant.[6] Exhibit KK was basically cumulative with reference to Lloyd's trial testimony, which was subject to cross-examination; it did not affect the defendant's substantial rights. *See Early v. People*, 178 Colo. 167, 496 P.2d 1021 (1972). The trial court's admission of Exhibit KK, though erroneous, was harmless.

▬ The defendant next argues that the trial court erred in admitting into evi-

---

**5.** In order for hearsay to be admissible as a statement against penal interest, CRE 804(b)(3) requires that the declarant be unavailable as a witness. Because Lloyd was available as a witness, this hearsay exception does not apply.

**6.** The defendant's assertion that Exhibit KK was prejudicial because of the reference therein to

his having killed someone in Arizona is unavailing as the defendant did not ask at the time the exhibit was admitted that the reference be excised. Such objection not having been made contemporaneously, it is waived for purposes of appeal. CRE 103(a)(1).

dence a transcript of Lloyd's November 19, 1980, oral statement to the CBI (Exhibit NN) in its entirety because it contained several irrelevant and prejudicial statements regarding drug-related criminal conduct by the defendant. During redirect examination of Lloyd the prosecution offered Exhibit NN as a prior consistent statement to rehabilitate Lloyd, pursuant to CRE 801(d)(1)(B). The defendant objected on the sole ground that the prosecution had not established a sufficient foundation for the admission of Exhibit NN, which objection the trial court overruled. The defendant at no time argued at trial, as he does on appeal, that certain allegedly irrelevant and prejudicial portions of Exhibit NN should have been excised prior to its submission to the jury. Our review of this issue must, therefore, proceed under a plain error standard. CRE 103(d). The majority of the objectionable portions of Exhibit NN refer to drug-related conduct by the defendant. Inextricably interwoven with evidence of the relationship among the defendant, Lloyd, Shaughnessy and the victim was evidence of extensive involvement by all four persons in drug-related activities. Some of the statements in Lloyd's deposition were arguably relevant to show the crime and subsequent cover-up in context. *See People v. Anderson*, 184 Colo. 32, 518 P.2d 828 (1974); *Johnson v. People*, 174 Colo. 413, 484 P.2d 110 (1971). In view of the great amount of evidence of the defendant's drug-related conduct admitted at trial, the references in the transcript to such criminal conduct were not so prejudicial as to constitute plain error. *See also People v. Dillon*, 655 P.2d 841 (Colo.1982); *People v. Mills*, 192 Colo. 260, 557 P.2d 1192 (1976).

## II

The defendant next contends that the trial court erred in permitting Lloyd to testify with regard to the defendant's participation in numerous drug transactions unrelated to the transaction connected with the victim's death. We disagree.

■ The defendant initially argues that the trial court did not give appropriate deference to the guidelines set forth in *Stull v. People*, 140 Colo. 278, 344 P.2d 455 (1959), and *People v. Honey*, 198 Colo. 64, 596 P.2d 751 (1979), in instructing the jury with regard to the evidence of the defendant's frequent drug dealing. Those cases, however, are applicable when evidence of prior *similar* transactions is offered. *See* § 16–10–301, 8 C.R.S. (1978 & 1985 Supp.). The evidence here challenged did not purport to describe prior similar criminal conduct. The evidence of the defendant's participation in illegal drug transactions was relevant to establish the context in which this murder occurred. *See People v. Gladney*, 194 Colo. 68, 570 P.2d 231 (1977), *cert. denied*, 434 U.S. 1038, 98 S.Ct. 776, 54 L.Ed.2d 787 (1978); *People v. Anderson*, 184 Colo. 32, 518 P.2d 828 (1974). Events surrounding a crime are admissible to establish the context in which the crime was committed, even if such events indicate the commission of unrelated crimes. *See People v. Geller*, 189 Colo. 338, 540 P.2d 334 (1975); *Anderson*, 184 Colo. 32, 518 P.2d 828; *White v. People*, 177 Colo. 386, 494 P.2d 585 (1972); *Johnson*, 174 Colo. 413, 484 P.2d 110.

■ The prosecution's theory of the case was that the defendant, Lloyd and Shaughnessy knew each other from prior drug dealings; that the defendant and Lloyd had a common interest in the August 28, 1980, searches of their residences for drugs; that while in jail on drug charges the two discussed the likelihood of an informant; that in the drug culture to which all three belonged, informants were despised; that the defendant suspected the victim of being the informant; that the victim went to the defendant's house on the day of the murder to buy drugs; that the opportunity to get more drugs was used as a pretext to lure the victim to the site of his death; and that the defendant killed the victim because of the defendant's belief that the victim had informed police officials about the defendant's drug-related conduct. The defendant's long-term involvement with illegal drugs formed the background for the vic-

tim's murder. That history was admissible to establish the context in which this offense occurred.

■ The defendant also argues that the trial court failed to instruct the jury properly on the limited basis for the admissibility of this evidence. The trial court conducted an *in camera* hearing to consider the extent to which evidence of the defendant's past drug-related conduct might be admissible. In its ruling on this sensitive issue, the trial court acknowledged the difficult balance between preventing prejudice to the defendant and permitting the prosecution to present its case against the defendant. The trial court then made detailed findings that the pre-August 28, 1980, drug activities of the defendant were necessary to establish the relationship between Lloyd and the defendant; that the events of August 28, 1980, were necessary to show the events leading up to the murder as well as to show motive; and that the events of September 11, 1980, were necessary to show the crime in context. The trial court prohibited any reference to the defendant's involvement with drugs while in Phoenix, Arizona, subsequent to the murder.

The trial court then worked closely with the defendant and the prosecution to fashion limiting instructions with regard to each of the three time periods. The trial court gave limiting instructions to the jury prior to any testimony by Lloyd concerning his initial relationship with the defendant, the events of August 28, 1980, or the events of September 11, 1980. The trial court gave a limiting instruction and reminded the jury in its concluding instruction that some of the evidence it had heard could be considered only for a limited purpose. These circumstances indicate that the trial court appropriately instructed the jury with regard to the limited bases for the admissibility of this evidence.

## III

The defendant next argues that the trial court erred in admitting into evidence four hearsay statements attributed to Shaughnessy. We disagree.

We first note that, with regard to three of the challenged statements, the defendant failed to include the issue of admissibility in his motion for new trial. We conclude that the admission of these three statements, even if erroneous, did not constitute plain error and, therefore, we decline to review the correctness of the trial court's rulings with respect to them. Crim.P. 33(a).[7]

The remaining evidentiary ruling relates to Shaughnessy's October 16, 1980, oral statement and her October 17, 1980, written statement given to CBI agents. The oral communication includes two critical themes: Shaughnessy's initial comment that the victim came to the defendant's house, bought some drugs, left, and was not seen again; and her modification of this comment to the effect that Lloyd and the defendant left the defendant's home with the victim and returned later that evening without the victim, that the defendant stated that he had cut his arm on a fence while trying to enter a drive-in movie

---

7. At the time of the new trial motion herein, Crim.P. 33(a) provided:

The party claiming error in the trial of any case must move the trial court for a new trial, and the trial court may not dispense with the necessity for filing such a motion but may dispense with oral argument on the motion after it is filed. Only questions presented in such motion will be considered by the appellate court on review.

In 1985, the new trial motion requirement of Crim.P. 33(a) was eliminated. Crim.P. 33(a) and (b) now provide:

[a] The party claiming error in the trial of any case may move the trial court for a new trial or other relief. If such a motion [is] filed, the trial court may dispense with oral argument on the motion after it is filed.

[b] The court may direct a party to file a motion for a new trial or other relief on any issue. The failure of the party to file such a motion when so ordered shall preclude appellate review of the issues ordered to be raised in the motion. The party, however, need not raise all the issues it intends to raise on appeal in such motion to preserve them for appellate review.

(effective July 1, 1985).

theater, and that the defendant told her to say that she had been with him at the drive-in theater. The written statement is essentially consistent with the second of Shaughnessy's October 16, 1980, oral statements.

■ When the prosecution initially offered these statements into evidence, the defendant objected on the ground that they were inadmissible hearsay. The prosecution contended that the statements fell within the exception for co-conspirator statements established by CRE 801(d)(2)(E), which rule provides as follows:

A statement is not hearsay if—

. . . .

The statement is offered against a party and is . . . a statement by a co-conspirator of a party during the course and in furtherance of the conspiracy.

The trial court found that a conspiracy to conceal the murder of the victim was continuing at the time Shaughnessy made the statements to the CBI agents and, on the basis of that finding, overruled the defendant's objections. CRE 801(d)(2)(E) requires that before a hearsay statement of a co-conspirator may be admitted into evidence, the proponent of the evidence must establish to the trial court's satisfaction that the statement was made in furtherance of the conspiracy as well as in the course of the conspiracy. *People v. Small*, 631 P.2d 148 (Colo.), *cert. denied*, 454 U.S. 1101, 102 S.Ct. 678, 70 L.Ed.2d 644 (1981); *People v. Best*, 665 P.2d 644 (Colo.App.1983). The existence of both these factors is necessary to establish the degree of reliability necessary to overcome the basis of the prohibition against the admission of hearsay statements in general—the concern that such un-cross-examined statements may not be reliable. The trial court made no finding as to whether Shaughnessy's statements to the CBI were made in furtherance of a conspiracy, and no such conclusion can

be inferred from the statements themselves.

■ The trial court did find that in October of 1980 Shaughnessy was participating in a conspiracy to conceal the true events surrounding the victim's murder. The evidence indicates that at that time the conspiracy included the fiction that on the night of September 11, Lloyd, Shaughnessy and the defendant attended a movie and later tried to sneak into a drive-in theater at which point the defendant cut his arm. However, Shaughnessy did not perpetrate the agreed-upon alibi but, to the contrary, revealed that the defendant had told her to say that she had accompanied the defendant to the two theaters. Those statements did not further the conspiracy as it existed in October of 1980; the trial court, therefore, erred in concluding that they were admissible pursuant to CRE 801(d)(2)(E).

■ This error, however, did not substantially prejudice the defendant. Shaughnessy's October statements relate a version of the events surrounding the murder which conflicts with the testimony of Lloyd, the prosecution's key witness. While they establish that the defendant instructed her to fabricate a story about the events of that evening, they do not directly connect the defendant with the murder. The most direct and damaging evidence connecting the defendant with the murder was supplied by Lloyd. Shaughnessy's October statements to the CBI seriously undermined Lloyd's credibility, thus assisting as much as prejudicing the defendant's defense. Regardless of the prosecution's strategy in introducing Shaughnessy's October statements,[8] we find that they were neither so crucial nor so devastating as to deny the defendant his fundamental rights. *See Dutton v. Evans*, 400 U.S. 74, 91 S.Ct. 210, 27 L.Ed.2d 213 (1970); *People v. Dement*, 661 P.2d 675 (Colo.1983). Accordingly, the trial court's

---

**8.** In closing arguments, the prosecution stated that the October 16, 1980, and October 17, 1980, statements acted to end the first conspiratorial cover-up and create the need for the subsequent story set forth in the defendant's November 6, 1980, letter to Lloyd and his March 7, 1981, letter to Shaughnessy.

error in admitting the hearsay statements was harmless. *See* Crim.P. 52(a).

## IV

■ The defendant's final argument that the cumulative effect of the trial court's errors denied him a fair trial is without merit. We have concluded that these evidentiary errors did not prejudice the defendant. We also determine that the combined effect of these errors did not prejudice the defendant's substantial rights and, therefore, must be deemed harmless. Crim.P. 52(a).

The judgment is affirmed.

LOHR, Justice, dissenting:

The majority acknowledges that the trial court erred in admitting several pieces of evidence at the trial of the defendant, Robert Williams, but concludes that the errors were harmless. Because of the highly prejudicial nature of some of this evidence, however, I cannot agree that Williams received a fair trial in spite of the admission of the evidence. Therefore, I respectfully dissent.

Williams and two other persons, Valerie Shaughnessy and Steven Lloyd, were charged with first degree murder and conspiracy to commit murder as the result of the death of a victim by stabbing. Lloyd testified at Williams' trial as a result of a plea bargain in his own case. Williams also testified, offering his version of the events resulting in the victim's death. Williams' testimony was that in a fit of anger Shaughnessy began stabbing the victim, that Williams and Lloyd tried to restrain her, and that Lloyd later also stabbed the victim. The evidence also contained a bewildering assortment of statements by each of the three persons charged describing several different and contradictory versions of the killing and the events that led to it. If Williams' testimony at trial was true, he was blameless. If the most damaging statement of Lloyd was true, Williams not only actively participated in the stabbing but planned the killing in advance. Thus, the credibility of the witnesses Williams and Lloyd was of critical importance at the trial. It is against this background that the majority concludes that the receipt of admittedly inadmissible evidence portraying Williams as a person with an extensive background of serious and reprehensible criminal activity, and also corroborating the testimony of Lloyd, was harmless. I cannot agree.

The first item of the evidence with which Williams takes issue is the People's exhibit KK, a letter to the Colorado Bureau of Investigation written by Steven Lloyd. Lloyd wrote the letter shortly after being questioned by two CBI agents on November 18, 1980. In the letter, Lloyd expressed his desire to "clear this whole situation up," and he purported to describe the events that occurred on the night that the victim was killed. The letter was admitted into evidence over proper objection during the direct examination of Lloyd. The majority acknowledges that the letter was inadmissible hearsay since it does not qualify as a prior consistent statement that was offered to rebut an express or implied charge of recent fabrication against Lloyd. Majority op. at 1282; *see* CRE 801(d)(1)(B). However, the majority determines that the admission of the letter was not prejudicial to Williams and therefore was harmless error. Majority op. at 1282–83; *see* Crim.P. 52(a).

In my view, the letter was prejudicial to the defendant in two respects. First, the letter essentially corroborated the testimony given by Lloyd at trial. This corroborative aspect of the letter takes on great significance in a case, like the present one, in which the credibility of the witnesses can be dispositive. Williams testified that there was no plan to kill the victim, that Valerie Shaughnessy attacked the victim first, and that Lloyd then stabbed the victim to death. Lloyd, on the other hand, testified that Williams devised a plan to kill the victim, that Shaughnessy attacked first, and that Williams then stabbed the victim to ensure that he died. The letter, as evidence supporting Lloyd's version of

the facts, could have encouraged the jury to believe Lloyd rather than Williams.

Furthermore, the letter contained a highly prejudicial reference to past criminal activity on the part of Williams. Lloyd wrote:

> When we first met, Bob [Williams] told me of an incident in Phoenix of how he finished a black guy who he, Bob, thought had burned down his house there. I don't [sic] how true this is, it's probably bullshit, but while standing there watching him stab [the victim] I did think and I figured, for my life, that I better go along with anything he wanted.

Evidence of prior criminality is never admissible to show the propensity of a defendant to commit a crime. *People v. Honey*, 198 Colo. 64, 67 n. 2, 596 P.2d 751, 754 n. 2 (1979); *see also Callis v. People*, 692 P.2d 1045 (Colo.1984); *People v. Lucero*, 200 Colo. 335, 615 P.2d 660 (1980); CRE 404(b). Such evidence is generally excluded in part to "guard against the likelihood that evidence of prior criminality having little bearing on the issue of guilt would assume undue proportion in the minds of the jurors with resulting prejudice to the accused." *Callis v. People*, 692 P.2d at 1051. The reference to a prior murder by the defendant has obvious potential for prejudice, but no conceivable relevance to the crime that is the subject of the present case. Given the prejudicial nature of exhibit KK, I cannot conclude that its erroneous admission was harmless.

After the CBI agents received Lloyd's letter, they interviewed him for several hours. The interview was recorded on tape and transcribed, and the transcript of the interview, exhibit NN, was admitted at trial during redirect examination of Lloyd. The transcript, which is fifty-five pages long, is another statement of Lloyd's version of the facts. In addition, it contains a multitude of references to drug-dealing and other criminal acts on the part of Williams having no relation to the crimes with which he was charged.

Williams argues that the trial court should have excised certain prejudicial, irrelevant portions of the transcript before admitting it, relying on *People v. DelGuidice*, 199 Colo. 41, 606 P.2d 840 (1979). As the majority points out, however, Williams failed to request that the transcript be edited at trial, and therefore, his objection to the admission of the unedited transcript must be reviewed under a plain error standard. In other words, reversal on the basis of exhibit NN is justified only if there is at least a reasonable possibility that the admission of the transcript in its entirety contributed to Williams' conviction. *People v. Mills*, 192 Colo. 260, 263, 557 P.2d 1192, 1194 (1976). My review of the transcript persuades me that it presented a grave possibility of prejudice to the defendant.

The transcript contains many references to drug transactions that were unrelated to the crime with which Williams was charged and several references to other unrelated criminal activities not involving drugs. For example, in answer to an agent's question about the existence of a plan to kill the victim, Lloyd provided the following unresponsive, prejudicial comments:

> [Williams] had a lot of the neighbor kids come around his house with hot items that they were jockey boxing out of cars and houses. And some little neighbor kid came around with a 22 caliber lugar [sic] or something and he was interested in buying it.

The agent, apparently recognizing that this information had no apparent connection with this case, prompted Lloyd to "get back to" his questions.

The remaining objectionable portions of the transcript concerned drug transactions in which Williams participated after the killing of the victim. Lloyd stated several times that shortly after Lloyd, Williams and Shaughnessy returned to Williams' house from the scene of the crime, "numerous" people called and "three to four people showed up" wanting to purchase quaaludes from Williams. He also stated that in the period following the victim's death and preceding Williams' move to Phoenix, Williams "had upped his dealing practice

not with the old people that we knew but with new people. Kids, high schoolers, people who just walk up to the door. ..." Lloyd asserted that he "really didn't like to be around Bob that much anymore because of all the little kids he was having running in and out of there...." Additionally, Lloyd told the agents that Williams had instructed Shaughnessy "to score 1500 hits of acid, one ounce of cocaine and five pounds of reefer to take to Phoenix with her," that Shaughnessy and Williams mailed some acid to the house of the person with whom they were staying in Phoenix, and that Williams told Lloyd that he was going to start "making a run" between Denver and Phoenix every two weeks.

The majority concludes that the admission of exhibit NN in its unedited form was not so prejudicial as to constitute plain error because some of the statements in the transcript were arguably relevant to show the crime and subsequent cover-up in context. Majority op. at 1283. It is true that we have allowed the admission of evidence of "all the facts which are necessary to prove the crime charged in the information, *when linked to the chain of events which supports that crime*, ... even though the evidence shows the commission of other crimes not presented in the information." *People v. Anderson*, 184 Colo. 32, 36, 518 P.2d 828, 830 (1974) (emphasis in original); *accord Hudson v. People*, 196 Colo. 211, 215, 585 P.2d 580, 582 (1978). Moreover, we have allowed evidence of other offenses by the defendant "when they are so interwoven with the principal transaction that it is necessary to show them in order to give true understanding to the offense charged." *Johnson v. People*, 174 Colo. 413, 416–17, 484 P.2d 110, 111 (1971); *see also People v. Geller*, 189 Colo. 338, 341, 540 P.2d 334, 336 (1975) ("evidence of the conversations and transactions, far from being wholly independent of the crime charged, were 'an integral part and parcel

of the total picture' which surrounded" the crime charged) (quoting *Wooley v. People*, 148 Colo. 392, 367 P.2d 903 (1961)).

The objectionable statements in the transcript, however, do not concern incidents that are "linked to the chain of events" that supported the crime or the cover-up, nor are they "interwoven" with those crimes. The drug-related incidents described in the transcript occurred after the killing of the victim, making it difficult to link them with that crime. Although these incidents did occur during the period of the alleged cover-up, they have nothing to do with the substance of that cover-up, which supposedly consisted of attempts by Williams, Shaughnessy and Lloyd to produce an alibi for the night of the killing. Furthermore, it is virtually impossible to find a relevant connection between the killing or the cover-up and the statements about Williams buying "hot items" from children.

Finally, the majority determines that the admission of exhibit NN did not constitute plain error because of the great amount of other evidence of Williams' drug-related conduct that was admitted at trial. It is true that evidence of Williams' drug-related activities can be found throughout the record, but we cannot know what effect the substantial additional, inadmissible evidence had in the jurors' minds. I do not believe that this court can properly conclude that the jury was not influenced by this prejudicial evidence. I would hold that the references to unrelated crimes by Williams found in exhibits KK and NN adversely affected Williams' substantial rights and deprived him of a fair trial.[1] I would therefore reverse and remand for a new trial.

I am authorized to say that Chief Justice QUINN and Justice DUBOFSKY join in this dissent.

---

1. The majority also acknowledges that the trial court erred in admitting hearsay statements by Shaughnessy but holds this error harmless as well. Majority op. at 1284–88. I do not address the harmfulness of this error since I be-

lieve the effect of the errors involving the admission of exhibits KK and NN, independently and in combination, is more than sufficient to compel reversal.