Tammy BURKE, Appellant (Defendant),

v.

The STATE of Wyoming,
Appellee (Plaintiff).

No. 86–67.

Supreme Court of Wyoming.

Dec. 3, 1987.

Leonard D. Munker, State Public Defender, Julie D. Naylor, Appellate Counsel (argued), Gerald M. Gallivan, Wyoming Defender Aid Program, and Megan Olson, Student Intern, for appellant.

A.G. McClintock, Atty. Gen., Gerald A. Stack, Deputy Atty. Gen., John W. Renneisen, Mary B. Guthrie, Sr. Asst. Attys. Gen., and Gerald P. Luckhaupt, Asst. Atty. Gen. (argued), for appellee.

Before BROWN, C.J., and THOMAS, CARDINE, URBIGKIT and MACY, JJ.

CARDINE, Justice.

Appellant was convicted of aiding and abetting in the delivery of methamphetamine in violation of §§ 6–1–201(a), W.S. 1977, 35–7–1031(a)(ii), W.S.1977, Cum.Supp. 1985, and 35–7–1016(d)(ii), W.S.1977, Cum. Supp.1985, and delivery of methamphetamine in violation of § 35–7–1031(a)(ii), W.S.1977, Cum.Supp.1985. She raises the following issues on appeal:

"I. Whether the Defendants have been denied due process and equal protection of the law by the actions of the prosecution in deliberately avoiding the preliminary hearing and obtaining indictments without observing minimal standards of fundamental fairness.

"II. Whether the current grand jury was improperly impaneled under Section 7–5–102 in that there was no necessity for said body, requiring the dissolution of the panel and the dismissal of the indictments.

"III. Whether the indictments in these cases are fatally defective for failure to conform to the statutory requirement that the foreman endorse the words 'A True Bill' upon each indictment.

"IV. Whether the indictments should be dismissed because the conduct of the grand jury lacks any indicia of reliability in the assessment of probable cause.

"V. Whether the two tape recordings were erroneously admitted under the co-conspirator exception to the hearsay rule.

"VI. Whether the prosecutor's question and gesture directed at Appellant's boyfriend resulted in Appellant being denied a fair trial.

"VII. Whether the Court can require a Defendant to pay for costs of prosecution as a part of her sentence."

The first four issues concerning the grand jury are the same issues presented to this court in *Hennigan v. State*, Wyo., 746 P.2d 360 (1987). We determined that there was no error with respect to those issues in Hennigan; and, for the reasons stated, we hold there was no error here with respect to issues I–IV. Upon the balance of the issues presented in this case, we affirm but modify the sentence to delete the conditions of probation requiring payment of costs of prosecution and reimbursement of attorney fees.

## FACTS

On January 17, 1985, appellant's husband Mike Burke, Gus Skurdal, and David Lauck met at Decker's East grocery store on Highway 59 in Campbell County. At that meeting Mr. Lauck, an undercover narcotics agent for the Campbell County Sheriff's Office, arranged to buy a half ounce of methamphetamine from Burke. Lauck "fronted" $1,100 to Burke and agreed to pick up the methamphetamine at Burke's residence the next day. When Lauck arrived at the Burke residence (a "trailer house" shared by appellant, Burke, and Skurdal), appellant was home, but Burke was not. Appellant suggested to Lauck that they search downtown for Burke. Lauck agreed and then drove appellant to several bars and a haircutting establishment in the downtown area. At each stop Lauck waited in the car while appellant went inside each establishment to search for her husband. She did not find him. Lauck drove her home, and she told Lauck that her husband would call him later, once he came home. Mike Burke called Lauck that evening from the trailer house and told him that he could come over and pick up the methamphetamine. Lauck drove to the Burke residence where Mike Burke gave him the methamphetamine. Appellant and Gus Skurdal were present when the transaction occurred.

On May 22, 1985, Gus Skurdal called Agent Lauck to set up another methamphetamine transaction. Lauck testified that he went to the Burke residence later that day and gave appellant $200 in exchange for two and one-half grams of methamphetamine. Appellant testified that she had no recollection of this transaction because on the day in question she was under the influence of medication prescribed by her dentist.

## THE CO–CONSPIRATORS' STATEMENTS

During direct examination of Officer Lauck, the prosecutor offered into evidence two audio tapes and requested that they be played for the jury. The first tape, offered in support of Count I, contained a January 17, 1985 telephone conversation between Agent Lauck and Mike Burke in which the two men set up the meeting at Decker's. The second tape, offered in support of Count II, contained a May 22, 1985 conversation between Lauck and Gus Skurdal in which Skurdal told Lauck that he could come to the Burke residence to pick up two and one-half grams of methamphetamine from appellant. The defense objected to the admission of both tapes on the grounds of hearsay and confrontation. The trial court overruled the objections, concluding that the statements were admissible under Rule 801(d)(2)(E), W.R.E., as statements of a co-conspirator during the course of and in furtherance of a conspiracy. Appellant now argues that the trial court erred in admitting the two tapes because the State did not produce sufficient evidence of a conspiracy on either count.

Under the Wyoming Rules of Evidence a statement is not hearsay if

"[t]he statement is offered against the party and is * * * (E) a statement by a co-conspirator of a party during the course and in furtherance of the conspiracy." Rule 801(d)(2)(E), W.R.E.

We have held that statements may be admitted into evidence under Rule 801(d)(2)(E) even if a conspiracy is not charged. *Jasch v. State*, Wyo., 563 P.2d 1327, 1333 (1977). In order for statements of a co-conspirator to be admitted under the rule, there must be prima facie evidence of a conspiracy independent of the co-conspirators' statements. *Dorador v. State*, Wyo., 711 P.2d 417, 418 (1985). This burden is met if there is sufficient evidence to permit the trial court to reasonably infer that a conspiracy existed. Id. at 418–419.

Our general conspiracy statute defines the elements of conspiracy as: (1) an agreement between one or more persons to commit a crime, and (2) an overt act to effect the objective of the agreement. Section 6–1–303, W.S.1977.[1] The existence of an agreement may be established through circumstantial evidence:

> "One might suppose that the agreement necessary for conspiracy is essentially like the agreement or 'meeting of the minds' which is critical to a contract, but this is not the case. Although there continues to exist some uncertainty as to the precise meaning of the word in the context of conspiracy, it is clear that the definition in this setting is somewhat more lax than elsewhere. A mere tacit understanding will suffice, and there need not be any written statement or even a speaking of words which expressly communicates agreement. * * *
>
> "Because most conspiracies are clandestine in nature, the prosecution is seldom able to present direct evidence of the agreement. Courts have been sympathetic to this problem, and it is thus well established that the prosecution may 'rely on inferences drawn from the course of conduct of the alleged conspirators.'" (Footnotes omitted.) W. LaFave and A. Scott, Criminal Law (1972) at pp. 460–461.

With respect to Count I, the State introduced the following evidence through the testimony of Agent Lauck: Lauck met with Mike Burke and Gus Skurdal and "fronted" the money for the drug purchase. He went to appellant's home to pick up the methamphetamine, and only appellant was there. Appellant told Lauck that her husband had acquired the methamphetamine and that it was of good quality. Appellant seemed afraid that Officer Lauck would be upset because the methamphetamine was not at the house at that time. At her own suggestion, she accompanied Lauck on a search for her husband; and, while on that search, she actively tried to find him. She continually reassured Lauck that the methamphetamine had been obtained and that he could get it from Mike Burke as soon as they found him. At this point in Lauck's testimony the trial court correctly admitted the first tape. The testimony supported an inference that an understanding existed between appellant and her husband, the understanding being that appellant would assist in delivering the methamphetamine. Her active assistance satisfied the overt-act requirement.

With respect to Count II, Lauck testified that on May 22, after agreeing to purchase two and one-half grams of methamphetamine from Gus Skurdal for $200, Lauck went to appellant's residence where he and appellant consummated the transaction on the same terms he had discussed with Skurdal. At this point the trial court admitted the second tape. This ruling was also correct, as the evidence supported an inference that appellant and Gus Skurdal agreed or understood that appellant would deliver the methamphetamine to Lauck. The delivery satisfied the overt-act requirement. The tapes were properly admitted.

## PROSECUTORIAL MISCONDUCT

In his cross-examination of appellant, the prosecutor sought to establish that appel-

---

1. Under the Wyoming controlled substances conspiracy statute, proof of an overt act is not required. Section 35–7–1042, W.S.1977; *Apodaca v. State*, Wyo., 627 P.2d 1023 (1981). The difference between the general conspiracy statute and the controlled substances conspiracy statute raises an issue as to whether a trial judge, in making a ruling on the admissibility of a co-conspirator's statement in a drug prosecution, should require the State to prove an overt act. Because the parties have not raised this issue, and the overt-act element is satisfied in the present case, we need not decide the issue.

lant was a drug user and that drugs were often present in her home. At one point during his questioning of appellant, the following exchange occurred:

"Q. Okay. From June 6th to June 26th, you had friends over and you used drugs inside that trailer?

"A. No, I did not.

"Q. Well, weren't you in bed with that man right back there when you were arrested and he had drugs?"

Defense counsel immediately objected, approached the bench, and asked for a mistrial:

"MR. WEERTS: I'd ask for a mistrial now. I think bringing up what Mr. Murray just did has totally ruined this case. She cannot get a fair trial, and I think that we must have a mistrial at this point. Bringing up the fact that she was arrested in bed with that man has nothing to do with the case.

"MR. MURRAY: There were drugs.

"THE COURT: It doesn't have anything to do with the case. The fact that she might have been doing drugs, might have had drugs might have something to do with it, but the fact that she might have been in bed with someone has absolutely nothing to do with the case at all.

"And I'm going to admonish the jury that they will not, they will disregard that question and any possible answers, and I'll warn you not to bring up those kinds of things again.

"I also want to tell you that it's the rule in this courtroom that you conduct your examination from behind the podium."

The court took the defendant's motion under advisement, then instructed the jury as follows:

"Ladies and Gentlemen, I want to tell you that you are to disregard that last question asked by Mr. Murray. The question is of no significance to this case and has absolutely nothing to do with the guilt or innocence of the defendant, and you are to disregard it totally and any answer that might have been given to that.

"You are not to consider it when you deliberate this case."

After the close of the evidence, defense counsel renewed his motion for a mistrial.[2] The court denied the motion, explaining:

"Though I don't think it's improper to ask her about the drugs, I think the manner in which you asked it, Mr. Murray, when you asked, and I think Mr. Weerts is right—in very graphic detail—about whether she was in bed with this fellow was I think putting it very nicely—that you pointed to the rather sleazy-looking individual in the back of the courtroom and asked whether or not there were drugs in bed with the two of them when she was arrested. It's the fact that she is with him.

"And the fact there were drugs is, of course, not prejudicial or not inflammatory in any way. But, to point out to the jury that this woman, who is a married woman, was in bed with this guy, I think that that is prejudicial.

"I'm not going to grant the mistrial, and the reason is this, number one, I don't think that it was so prejudicial that it creates a situation where the defendant cannot get a fair trial.

"Secondly, and I guess they're tied together, one of [the] major reasons I feel that way is because defense counsel from the very beginning, even from the time of voir dire, told the jury that this woman used drugs, number one, number two, that she lived with some man not her husband, and asked that the jury

2. "[MR. WEERTS:] As I remember the situation, Mr. Murray turned himself around, pointed to my client's boyfriend, who was sitting in the back of the courtroom. He has long hair, he is dressed in a T shirt and a vest, and pretty much, I'd say, looks like a hippie or a motorcycle fellow or something on that order, points to him and asks my client about being arrested with this man while she's in bed with him.

"And, as I understand it, Mr. Murray's reason for doing that was cross-examination as to whether she knew anyone in her house over a period of time and whether that person ever had drugs in the house.

"I think that it's clear that the real reason for Mr. Murray doing what he did was to prejudice the jury against my client, and it's God awful as far as prejudice."

members, if they were going to hold that against her. I think from that moment on these jury members expected to hear that. It was something brought up by defense counsel originally, not by the prosecution."

In response defense counsel asserted:

"In voir dire I did ask the jury a question about whether they would hold anything against my client if it was shown that she was living in the same house with another man.

"My reason for asking those questions was that she was living in a house with Gus Skurdal, and I don't think there was any evidence about any kind of male-female relationship between Gus Skurdal and Tammy Burke. And I just wanted to make sure that the jury didn't think poorly of my client simply for living with Gus Skurdal. I in no way envisioned the bringing up of the fact that she was arrested in bed with another man. That wasn't my purpose."

Appellant now argues that the prosecutor's conduct denied her a fair trial and that the trial court erred in declining to declare a mistrial. In considering a claim of prosecutorial misconduct, we must review the entire record to determine whether the prosecutor's conduct resulted in substantial prejudice amounting to the denial of a fair trial. *Lindsey v. State*, Wyo., 725 P.2d 649 (1986). In reviewing the record, we must evaluate the state of the evidence and the probability of prejudicial impact on the defendant under the circumstances of the particular case. *Stogner v. State*, Wyo., 674 P.2d 1298, 1302 (1984). Appropriate objections and subsequent curative instructions may cure any error. *Lindsey v. State*, supra.

■ We agree with the trial court that the conduct of the prosecutor was highly improper. Viewing the record as a whole, however, we cannot conclude that the prosecutor's misconduct deprived appellant of a fair trial. During voir dire the jury members indicated that they would not tend to convict appellant because she lived with a male roommate to whom she was not married or because that male roommate was

dealing drugs. When the prosecutor asked the improper question, appellant had already admitted that she used methamphetamine. In addition, after the prosecutor asked the question and before appellant answered it, the trial court instructed the jury in no uncertain terms that they should disregard the prosecutor's question. We must assume that the jury followed the court's curative instruction. *Madrid v. State*, Wyo., 592 P.2d 709 (1979); *Simms v. State*, Wyo., 492 P.2d 516, cert. denied 409 U.S. 886, 93 S.Ct. 104, 34 L.Ed.2d 142 (1972). Appellant has failed to demonstrate substantial prejudice. We conclude that the prosecutor's conduct did not deny appellant a fair trial.

### COSTS OF PROSECUTION

■ On each count appellant was sentenced to one to two and one-half years in the Wyoming State Women's Center and assessed a $500 fine. The trial judge suspended all but 28 days of the sentence of incarceration, gave appellant credit for 28 days previously served, and placed appellant on probation for a period of five years, subject to numerous conditions, one of which required that appellant

"[p]ay court costs, for transportation of witnesses, for which the court specifically finds that there was not a justiciable issue concerning chain of custody and laboratory results, and the court specially finds the amount of those costs to be five hundred thirty-two dollars sixty-two cents ($532.62)."

During the sentencing hearing the trial court referred to the costs assessed for transportation of witnesses as "costs of prosecution." Appellant asserts that the trial court improperly required her to pay costs of prosecution as part of her sentence. We agree. In order to explain our conclusion, we find it necessary to examine in some detail the relevant statutes as they existed at the time when appellant was sentenced.

■ It is well established that a court cannot tax costs in a criminal case without express statutory authority. *Bernard v. State*, Wyo., 652 P.2d 982 (1982). At the

time appellant was sentenced, authority for the assessment of costs of prosecution in misdemeanor cases was found in § 7–11–516, W.S.1977, which provided that when a defendant was convicted of a misdemeanor,

> "the punishment shall be within the discretion of the court, limited as penalties now are by law, except that payment of the costs of prosecution may be added to and made a part of the sentence * * *."

The statute clearly allows such costs to be incorporated into the convicted misdemeanant's sentence.

When appellant was sentenced, there was no similar statute dealing with felonies. Prior to the revision of the criminal code in 1983, § 6–1–105, W.S.1977, provided:

> "Within the limits prescribed by law, the court shall determine and fix the punishment for any felony or misdemeanor, whether the punishment consists of imprisonment, or fine, or both, and when any person is sentenced to imprisonment in the penitentiary, the court shall declare in its sentence, for what period he shall be imprisoned; and in all cases of a conviction of an offense, the court shall render judgment against the defendant for the costs of prosecution."

A careful reading of this statute reveals that it required a sentencing judge to "render judgment" for costs of prosecution in both misdemeanor and felony cases; but, unlike § 7–11–516, it did not state that the payment of such costs may be "added to and made a part of the sentence." In any event, § 6–1–105 was amended. In the revised criminal code, effective July 1, 1983, the corresponding statute appears as § 6–10–104, W.S.1977, which reads:

> "Within the limits prescribed by law, the court shall determine and fix the punishment for any felony or misdemeanor, whether the punishment consists of imprisonment, or fine, or both."

**3.** Such authority is now found in § 7–11–505, W.S.1977, enacted in 1987, which provides:

Thus, the legislature deleted the provision permitting judgment for the costs of prosecution in felony cases. As a result, the criminal code provided no authority for assessing costs of prosecution against appellant.[3]

■ The Code of Civil Procedure contains limited authority for the assessment of costs of prosecution in criminal cases. Section 1–14–102, W.S.1977, permits the trial court in a criminal case to assess expert witness fees as costs against any party "in the discretion of the court." Absent a statutory provision to the contrary, however, liability for such costs is in the nature of a civil debt enforced by means of judgment and execution. The Code of Civil Procedure provides no authority for the assessment of costs as part of a criminal sentence or as a condition of probation.

■ The State contends that § 7–1–112(c) of the Public Defender Act permits the assessment of costs of prosecution as a condition of probation. That section provides:

> "(c) To the extent that a person covered by W.S. 7–9.20 [§ 7–1–110] is able to provide for an attorney, the other necessary services and facilities of representation, and court costs, the court may order him to provide for their payment."

The Public Defender Act does not define the term "court costs" or specify the manner in which the court's assessment of costs is to be enforced. In our view, however, the 1983 amendment to § 6–1–105, represented a legislative determination that an assessment of costs of prosecution should not be a part of the sentencing procedure in felony cases; and nothing in the Public Defender Act, as it then existed, mandates a contrary conclusion.

■ The State contends also that even without express statutory authority, a trial judge may assess costs of prosecution as a condition of probation under the broad discretion granted by § 7–13–303, W.S.1977, Cum.Supp.1986.[4] In *Lansing v. State,*

> "Payment of the costs of prosecution may be added to and made a part of the sentence in any felony or misdemeanor case."

**4.** Section 7–13–303, W.S.1977, Cum.Supp.1986, provides:

Wyo., 669 P.2d 923, 927 (1983), we held that "[s]entencing judges have wide discretion in determining appropriate conditions of probation." Such discretion, however, is not unlimited; it must be exercised within the confines of the authority granted by the legislature. See *Hicklin v. State*, Wyo., 535 P.2d 743, 79 A.L.R.3d 1050 (1975). Because the legislature, in enacting § 6-10-104, W.S.1977, supra, specifically deleted the language permitting assessment of costs of prosecution, we hold that the trial judge exceeded his authority by assessing costs of prosecution as a condition of appellant's probation.

## ASSESSMENT OF ATTORNEY FEES UNDER THE PUBLIC DEFENDER ACT

■ As a separate condition of probation, the trial court ordered appellant to "reimburse" the State and Campbell County for services provided by the court-appointed public defender. The following provisions of the Wyoming Public Defender Act, as it existed when appellant was sentenced, addressed the subject of payment and reimbursement of attorney fees by indigent defendants:

"Section 7-1-110. Right to attorney; cost; other rights.

"(a) A needy person who is being detained by a law enforcement officer, or who is under formal charge of having committed, or is being detained under a conviction of, a serious crime, is entitled:

"(i) To be represented by an attorney to the same extent as a person having his own counsel if so entitled; and

"(ii) To be provided with the necessary services and facilities of representation (including investigation and other preparation).

"(b) The attorney, services and facilities, and court costs shall be provided at public expense to the extent that the person, at the time the court determines need, is unable to provide for their payment."

"Section 7-1-112. Determination of needy person.

"(a) Determination of whether a person covered by W.S. 7-9.20 [§ 7-1-110] is a needy person shall be deferred until his first appearance in court or in a suit for payment or reimbursement under W.S. 7-9.24 [§ 7-1-114], whichever occurs earlier. Thereafter, the court concerned shall determine, with respect to each proceeding, whether he is a needy person.

\* \* \* \* \* \*

"(c) To the extent that a person covered by W.S. 7-9.20 [§ 7-1-110] is able to provide for an attorney, the other necessary services and facilities or representation, and court costs, the court may order him to provide for their payment."

"Section 7-1-114. Recovery of payment.

"(a) The attorney general may, by suit within six (6) years after the date the services were rendered, on behalf of the state, recover payment or reimbursement, as the case may be, from each person who has received legal assistance or another benefit under this act:

"(i) To which he was not entitled;

"(ii) With respect to which he was not a needy person when he received it; or

"(iii) With respect to which he has failed to make the certification required by W.S. 7-9.22(b) [§ 7-1-112(b)].

"(b) Amount recovered under this section shall be paid into the state general fund."

The quoted provisions clearly indicate that those persons who seek assistance under the Act may be required to pay for services and costs to the extent that they are able to pay at the time assistance is requested. This requirement may be enforced by court order at the time the court determines need. The need referred to is need at the time assistance is requested. Such need may be determined either at the defendant's "first appearance," some later time, or in a suit by the State under § 7-1-114. At appellant's arraignment the trial court ordered appellant to "repay the state for

"The court shall determine and may, by order duly entered, impose in its discretion, and

may at any time modify any condition of probation or suspension of trial or sentence."

the costs of the public defender at the rate of $50 per month." The question we face is whether this order was improperly incorporated into appellant's sentence as a condition of probation.

When appellant was sentenced, the Public Defender Act contained its own enforcement provisions, none of which contemplated criminal sanctions for noncompliance.[5] As we interpret the Act as it then existed, any liability for payment or reimbursement constituted a civil debt; and an order entered pursuant to the Act was not a proper element of the sentencing proceeding. We hold that the district court erred by requiring appellant to reimburse the State for the services of her public defender as a condition of her probation.

Affirmed as modified.

URBIGKIT, Justice, dissenting in part and concurring in part.

## COUNTS I THROUGH IV

My dissent in *Hennigan v. State*, Wyo., 746 P.2d 360 (1987) addresses Issues I through IV, and is now included by reference without reamplification.

## ASSESSED ATTORNEY'S FEES AND COSTS IN SENTENCE

I concur in deletion of attorney's fees and witness costs from appellant's sentence. Observing that the legislature has more recently reexamined the subject in passage of the present statute, § 7–11–505, W.S.1977, effective May 22, 1987, it is not now timely to consider the constitutional issues implicit in incarceration for debt if ability to pay is absent. To be noted, however, is that any statutory authorization or constitutional justification is lacking for the procedure presented here, where the accused defendant without resources is ordered to make monthly payments during the course of defense in order to be afforded the constitutional right of representa-

tion. *People v. Cozad*, 158 Ill.App.3d 664, 110 Ill.Dec. 376, 511 N.E.2d 211, appeal denied 116 Ill.2d 564, 113 Ill.Dec. 306, 515 N.E.2d 115 (1987); *State v. Henry*, Tenn. Crim.App., 733 S.W.2d 127 (1987). This was particularly true since the defendant was unemployed. *Dryden v. State*, Wyo., 535 P.2d 483 (1975).

## COUNSEL AT ARRAIGNMENT WHEN PLEA IS ENTERED

In *Deckert v. State*, No. 86–34, dismissed July 27, 1987, occasion was initially afforded to discuss this subject in detail which, for whatever reason, was not again briefed in this appeal. After commutation, the Deckert appeal was dismissed without published opinion. Except to illuminate the events portrayed in procedural travail of this record, the defect will not be comprehensively analyzed since further opportunity will likely be utilized in another of these grand jury appeals to evaluate this incomprehensible violation of both constitutional imperatives and the specific provision of Rule 6, W.R.Cr.P. requiring assignment of counsel "to represent him at every stage of the proceedings from his initial appearance before the commissioner or the court through appeal, unless he waives such appointment."

After indictment on June 25, 1985, arrest on June 26, and arraignment with five other persons on June 27, the following occurred:

"THE COURT: Tammy Burke?
"DEFENDANT BURKE: Yes."

In general address to the group:

"And if you plead not guilty and you are questioned or asked to be questioned, you may refuse to answer as any answers you give can and may be used against you.

"During any questioning you may stop answering at any time.

---

5. Former § 7–1–112, W.S.1977, now appears as § 7–6–106, W.S.1977, and contains the following provision:
   "If the court orders probation before sentence, suspended sentence or probation, the court shall order the needy person as a condition of sentence or probation to repay the state for expenses and services provided by appointed attorneys pursuant to the state public defender's standard fee schedule."

"And I would advise you that if you do answer questions you should first consult with an attorney.

\*     \*     \*     \*     \*     \*

"THE COURT: Miss Burke, you are charged with a violation of Section 35–7–1031(a)(ii)."

The trial court then comprehensively advised her about the statute and the aiding-and-abetting statute, § 6–1–201(a), W.S. 1977, and then said:

"So, if you are convicted of both counts or plead guilty to both counts you could receive a maximum penalty of up to 20 years and a $20,000 fine.

"*In addition, you could be required to make restitution for your court-appointed attorney, if you have one; you could be required to pay the costs of prosecution, and to make restitution, if there is any.*

"Do you understand that?

"DEFENDANT BURKE:     Yes,     sir." (Emphasis added.)

Thereafter, she was extensively questioned about income and assets in the open-court session in a manner which was essentially negative.[1]

---

1.  "THE COURT: \* \* \* Miss Burke, how old are you?
    "DEFENDANT BURKE: 24.
    "THE COURT: Are you married?
    "DEFENDANT BURKE: Separated.
    "THE COURT: Do you have any children?
    "DEFENDANT BURKE: No.
    "THE COURT: Do you live with anyone else or by yourself?
    "DEFENDANT BURKE: Living with my roommate.
    "THE COURT: Who is?
    "DEFENDANT BURKE: Gus Kurdol and Kendall Smith.
    "THE COURT: Two roommates?
    "DEFENDANT BURKE: Yeah.
    "THE COURT: Are they—the last one was named Kendall, is that a man or a woman?
    "DEFENDANT BURKE: Man.
    "THE COURT: You are living with two men; is that correct?
    "DEFENDANT BURKE: Yeah.
    "THE COURT: Are you working?
    "DEFENDANT BURKE: I quit Memorial weekend."
    After queries about her going to Colorado to try to find her husband and then returning to Gillette, the trial court further inquired:
    "THE COURT: Are [your roommates] supporting you right now?
    "DEFENDANT BURKE: No. I'm supporting myself, as far as I can.
    "THE COURT: Well, if you are not working, how are you supporting yourself?
    "DEFENDANT BURKE: Selling ceramics, paintings, doing murals on the walls and stuff.
    "THE COURT: You are an artist? How much money do you make?
    "DEFENDANT BURKE: It varies. Sometimes I do it free. I just—
    "THE COURT: When you don't do it free, how much do you make?
    "DEFENDANT BURKE: It varies. $50 here and there.
    "THE COURT: Well, then you are not making enough to live on, obviously. Are your roommates supporting you?
    "DEFENDANT BURKE: No.
    "THE COURT: Well, if you are not making enough money to live on, and your roommates aren't supporting you, obviously you haven't starved to death. How are you living?
    "DEFENDANT BURKE: Fine. I don't—I just wake up in the morning and do house cleaning and everything. That's it.
    "THE COURT: All right.
    "DEFENDANT BURKE: Do bookkeeping.
    "THE COURT: Do you have an automobile?
    "DEFENDANT BURKE: Half of it. I share a '62 Impala with my roommate, Gus Kurdol. I work on that.
    "THE COURT: Do you own anything else?
    "DEFENDANT BURKE: No.
    "THE COURT: You have to speak up.
    "DEFENDANT BURKE: No, sir.
    "THE COURT: Do you have any debts?
    "DEFENDANT BURKE: Yes, sir.
    "THE COURT: What debts?
    "DEFENDANT BURKE: Hospital, telephone, credit bureaus.
    "THE COURT: What do you owe the hospital for?
    "DEFENDANT BURKE: Foot injury.
    "THE COURT: How much do you owe?
    "DEFENDANT BURKE: I can't think of it right off hand.
    "THE COURT: Well, give me an estimate.
    "DEFENDANT BURKE: $30. Something.
    "THE COURT: $30? All right. How much to the credit bureau?
    "DEFENDANT BURKE: Another forty-five.
    "THE COURT: All right. Who else do you owe money to?
    "DEFENDANT BURKE: Phone company. Televents.
    "THE COURT: How much do you owe them?
    "DEFENDANT BURKE: Six hundred-something to the phone company back in Colorado.
    "THE COURT: Do they have a judgment against you?
    "DEFENDANT BURKE: No, sir. It's against my husband.
    "THE COURT: All right. Was he obligated to pay that account?

In regard to the appearance bond, the county attorney stated and the trial court advised with reference to appointed counsel:

"MR. MURRAY: Let me back up, if I can, Your Honor. On Miss Burke, her ties with the community are somewhat tenuous. And I think that in this particular set of circumstances, in light of the fact that she's unemployed and really has no ties to the community, her husband is out of state, we would be requesting a cash or corporate surety bond on Miss Burke.

\* \* \* \* \* \*

"Mr. Murray, would you come up to the bench for a moment. (At which time the court and Mr. Murray met at the bench.)

"THE COURT: It's my intention to then assign attorneys to those of you, as I said, that need to have attorneys. [*Tammy Burke was not included.*]

"The rest of you I'm going to give you some time to get an attorney.

"And I'm going to tentatively set a date at which time you will return to court and enter your plea, rather than request you to do so today without having consulted with an attorney.

"And I see that we still have someone from the public defender's office present.

"Mr. Rosenthal, have you spoken with your director about the possibility of sending some help up to take care of these cases?

"MR. ROSENTHAL: Yes, I have, Your Honor.

"THE COURT: And what was his response?

"MR. ROSENTHAL: We'll have to take care of it initially ourselves, but we will be getting some help later.

"THE COURT: All right. For trials and those sorts of things?

"DEFENDANT BURKE: That's why we're looking for him. I got all these bills.
"THE COURT: All right. I understand that. And how much do you owe Televents?
"DEFENDANT BURKE: Seventeen-something.
"THE COURT: Just for a monthly charge then?"

"MR. ROSENTHAL: Right.

"THE COURT: Mr. Rosenthal, if I started setting some of these down within about 8 to 10 days for pleas, are you going to be able to consult with some of these people?

"MR. ROSENTHAL: We would hope so, yes.

"THE COURT: Thank you.

\* \* \* \* \* \*

"Miss Burke, you are also given 10 days to have an attorney enter an appearance, and your plea hearing is also set at, yours is set at 8:15 on Monday, July 8th.

"Mr. Boykin, Mr. Cusson, Mr. Blanchard, and Miss Barnett, the public defender is represented—or is appointed to represent each of you. [*But not Tammy Burke.*]

"And your cases are all set for 8:30, Friday, 8:30 in the morning, Friday, July 5th.

"At that time you can enter your pleas in these cases.

"Mr. Boykin, and Miss Barnett, and Mr. Blanchard, the three of you are all released on a $50,000 unsecured bond."

Considering the absence of any resources and the decision that she would not be released, the disinclination of the trial court at that time to appoint an attorney is not understood. *Hoskins v. State*, Wyo., 552 P.2d 342, 350, reh. denied 553 P.2d 1390 (1976), cert. denied 430 U.S. 956, 97 S.Ct. 1602, 51 L.Ed.2d 806 (1977); *State v. Henry*, supra, 733 S.W.2d 127.

Thereafter, on July 8, Tammy Burke, having remained in jail without having arranged for bond, was again taken before the trial court.

"THE COURT: Looks like we have Miss Burke up here first so we'll begin with that case. Court is in session in criminal

"DEFENDANT BURKE: No. I—they took it out of my deposit, and I just recently started getting the bills in my husband's name. It was about 4 months overdue, 5 months overdue.
"THE COURT: Okay. Do you have any other debts?
"DEFENDANT BURKE: Yeah, but I can't think of them right now."

No. 2052, State of Wyoming versus Tammy Burke.

"Miss Burke, are you presently under the influence of alcohol or drugs?

"THE DEFENDANT: No, sir.

"THE COURT: Do you have any mental defect which would impair your ability to understand these proceedings?

"THE DEFENDANT: No, sir.

"THE COURT: Are you the same Debbie—or Tammy Burke—excuse me—that appeared here on the 27th of June, 1985?

"THE DEFENDANT: Yes, sir."

After reinquiry about the charges with which she was faced, the trial court further examined the unrepresented defendant:

"THE COURT: Miss Burke, as I recall, I ordered you to have an attorney enter an appearance in this case before today, and I don't see that that has been done. Why is that?

"THE DEFENDANT: I have no idea, sir. I have been trying.

"THE COURT: Who have you talked to?

"THE DEFENDANT: Nobody yet, I guess. I have just been trying. I have been here for 12 days, and I haven't got nobody.

"THE COURT: Are you ready to enter a plea in this case?

"THE DEFENDANT: I can, sir, yes.

"THE COURT: All right. Why don't you please stand.

"To the charge that on the 18th day of January, 1985, in Campbell County, Wyoming, you did aid and abet in the commission of a felony, the delivery of methamphetamine, how do you plead?

"THE DEFENDANT: Not guilty.

"THE COURT: And to count II, that on or about the 22nd day of May, 1985, in Campbell County, Wyoming, you did unlawfully deliver or possess with intent to deliver methamphetamine, how do you plead?

"THE DEFENDANT: Not guilty."

Consequently, without resources and without an attorney, and after 12 days incarceration, the indicted defendant was required to enter a plea, in disregard of the Constitution, counseled discussion, and Rule 6, W.R.Cr.P.

### WHETHER THE TAPE RECORDINGS WERE ERRONEOUSLY ADMITTED UNDER THE CO–CONSPIRATOR EXCEPTION TO THE HEARSAY RULE

Although I agree that the tape of the co-conspirator's statements should be admissible, I concur with the court on this issue to state general agreement on the conclusion adopted but strong concern with the standard required and the process to be used for admission as shown by this record. The majority correctly state that in order for statements of a co-conspirator to be admitted under Rule 801(d)(2)(E), W.R.E., there must be proper proof[2] of a conspir-

**2.** What is proper proof is a heavily adjudicated question. In most recent consideration by the United States Supreme Court in *Bourjaily v. United States,* — U.S. ——, 107 S.Ct. 2775, 97 L.Ed.2d 144 (1987), the test was "a preponderance of proof." Id. at 2776. The cases are not even in agreement whether admission is covered by Rule 104(a), W.R.E. only, or whether subsection (b) applies as providing the criteria of "evidence sufficient to support a finding." *United States v. Enright,* 579 F.2d 980 (6th Cir. 1978). A prima facie test is frequently stated. However, in the Bourjaily case, Justice Rehnquist, after stating in text "by a preponderance of proof," expressly reserved:

"* * * We hold that when the preliminary facts relevant to Rule 801(d)(2)(E) are disputed, the offering party must prove them by a preponderance of the evidence. [Fn.1]

"[Fn.1] We intimate no view on the proper standard of proof for questions falling under Federal Rule of Evidence 104(b) (conditional

relevancy). We also decline to address the circumstances in which the burden of coming forward to show that the proffered evidence is inadmissible is appropriately placed on the nonoffering party. See E. Cleary, McCormick on Evidence, § 53, p. 136, n. 8 (3d ed. 1984). Finally, we do not express an opinion on the proper order of proof that trial courts should follow in concluding that the preponderance standard has been satisfied in an on-going trial." *Bourjaily v. United States,* supra, 107 S.Ct. at 2779, n. 1.

In *Lego v. Twomey,* 404 U.S. 477, 92 S.Ct. 619, 30 L.Ed.2d 618 (1972), Justice White defined the test for admission of a confession as a preponderance of the evidence in considering a Jackson–Denno hearing. The substantial-evidence standard is used in Florida, *State v. Wilson,* Fla.App., 466 So.2d 1152 (1985), for initial introduction and a preponderance at trial as then answered by failure of meeting the burden by a

acy independent of the co-conspirator's statements. If such evidence exists, then the trial court may reasonably infer that a conspiracy existed, whereupon the statements become admissible as not hearsay. *United States v. Edrington*, 726 F.2d 1029 (5th Cir.1984); *United States v. Williams*, 668 F.2d 1064 (9th Cir.1981); *State v. Gortarez*, 141 Ariz. 254, 686 P.2d 1224 (1984); *People v. Steccone*, 36 Cal.2d 234, 223 P.2d 17 (1950); *Williams v. People*, Colo., 724 P.2d 1279 (1986); *State v. Nirschl*, 208 Kan. 111, 490 P.2d 917 (1971); *State v. Meredith*, La., 403 So.2d 712 (1981); *Commonwealth v. Bongarzone*, 390 Mass. 326, 455 N.E.2d 1183 (1983); *State v. Cornman*, Mo., 695 S.W.2d 443 (1985); *State v. Stever*, Mont., 732 P.2d 853 (1987); *Carr v. State*, 96 Nev. 238, 607 P.2d 114 (1980); *Laske v. State*, Okla.Crim., 694 P.2d 536 (1985); *State v. Gray*, Utah, 717 P.2d 1313 (1986); *State v. Guloy*, 104 Wash.2d 412, 705 P.2d 1182 (1985), cert. denied 475 U.S. 1020, 106 S.Ct. 1208, 89 L.Ed.2d 321 (1986).

See *Jasch v. State*, Wyo., 563 P.2d 1327 (1977), McClintock, J., dissenting, and footnote citation therein of *United States v. Nixon*, 418 U.S. 683, 701, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1974), quoting the rule.

The procedural disaffinity portrayed by this record is the pretrial absence of a Rule 104, W.R.E. hearing on the admissibility of this significant evidence. See Rule 1101(b)(1), W.R.E.[3]

Defense counsel through adequate pretrial preparation, and the trial judge in an orderly trial process, should *normally* resolve such significant evidentiary questions in advance of trial in a *Jackson v. Denno*, 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964) hearing.[4] This is particularly true because of the differentiated proof standard derived from Rule 104 and Rule 1101(b), as well as Rule 801, W.R.E.

"We reject any suggestion that by abolishing the bootstrapping rule, the Federal Rules of Evidence have changed the

---

curative instruction or a mistrial. Prima facie initially is used in California, *People v. Steccone*, 36 Cal.2d 234, 223 P.2d 17 (1950). Colorado utilizes to the trial court's satisfaction, *Williams v. People*, Colo., 724 P.2d 1279 (1986). Preponderance is used in Washington, *State v. Guloy*, 104 Wash.2d 412, 705 P.2d 1182 (1985), cert. denied 475 U.S. 1020, 106 S.Ct. 1208, 89 L.Ed.2d 321 (1986). Massachusetts employs adequate probability, *Commonwealth v. Bongarzone*, 390 Mass. 326, 455 N.E.2d 1183 (1983). See excellent discussion and consequent adoption of preponderance test, *United States v. Enright*, supra, and as rejecting a second trial instruction on weight. See also *United States v. Petrozziello*, 548 F.2d 20 (1st Cir.1977).

**3.** "(b) Rules inapplicable.—The rules other than those with respect to privileges do not apply in the following situations:
"(1) Preliminary Questions of Fact.—The determination of questions of fact preliminary to admissibility of evidence when the issue is to be determined by the court under Rule 104(a)." Rule 1101(b)(1), W.R.E.

**4.** The fair hearing mandated by *Jackson v. Denno*, supra, generally is called the Jackson–Denno hearing. *State ex rel. Feeney v. District Court of Seventh Judicial District*, Wyo., 607 P.2d 1259, reh. denied 614 P.2d 710 (1980), involving a hearing and determination pretrial "in which both the underlying factual issues and the voluntariness of his confession are actually and reliably determined," *Jackson v. Denno*, supra, 378 U.S. at 380, 84 S.Ct. at 1782. This proceeding should usually be initiated with a defense

motion under Rule 16, W.R.Cr.P., and consequent proceedings in advance of trial. *Mayer v. State*, Wyo., 618 P.2d 127, 128 (1980); Annot., 63 A.L.R.3d 311. Cases may occur where, absent motion to suppress or motion in limine, the issues are first found to rise during trial and must then be addressed in separate inquiry with the jury excused. In many cases, the Jackson–Denno hearing may be effectively dispositive of the criminal proceeding. See *Hayes v. State*, Wyo., 599 P.2d 558 (1979). See also *Shields v. Carnahan*, Wyo., 744 P.2d 1115 (1987) in regard to amendment or rescission of pretrial order.

The availability and use of the Jackson–Denno hearing should be much broader than the voluntariness of confession inquiry as to include motions in limine or to suppress initiated under Rule 16, W.R.Cr.P. Commentary, *The Motion in Limine: Pretrial Trump Card in Civil Litigation*, 27 U.Fla.L.Rev. 531 (1974); Rothblatt and Leroy, *The Motion in Limine in Criminal Trials: A Technique for the Pretrial Exclusion of Prejudicial Evidence*, 60 Ky.L.J. 611 (1971); Comment, *The Evidence Ruling at Pretrial in the Federal Courts*, 54 Cal.L.Rev. 1016 (1966).

Suppression on a search and seizure issue is jurisdictionally reserved to the district court. Rule 40(e), W.R.Cr.P. The wide scope of preliminary inquiry and decision broadly considered in Rule 104 should also include preliminary questions concerning the qualification of a person to be a witness, existence of a privilege, or the admissibility of evidence, with exclusion of Rule 1101, and the applicability of subsection (b), quoted supra n. 3, is significant.

co-conspirator hearsay exception such that it is no longer 'firmly rooted' in our legal tradition. The bootstrapping rule relates only to the *method of proof* that the exception has been satisfied. It does not change any element of the co-conspirator exception, which has remained substantively unchanged since its adoption in this country." *Bourjaily v. United States,* —— U.S. ——, ——, 107 S.Ct. 2775, 2783, 97 L.Ed.2d 144 (1987), fn.4. Justice Rehnquist apparently says that initial admission is "by a preponderance of proof," but that evidentiary effect as to conviction falls within proof beyond a reasonable doubt.

Preliminary decisions on admissibility pursuant to Rule 16, W.R.Cr.P. and Rule 104, W.R.E. for orderly presentation and advance preparation by counsel are highly preferable. Obviously, the opportunity for defendant to request a hearing is dependent upon knowledge as furnished by the prosecutor that introduction of Rule 801 evidence is anticipated. Cf. *United States v. Valencia,* 826 F.2d 169 (2d Cir.1987), where apparently the government requested the hearing. This is not to say that in the discretion of the court in management of the case, particularly with trial time developments, no exceptions may properly occur. It is also recognized that trial of a strict conspiracy case is singularly different than trial of a defined crime where one of the elements of proof is derived through co-conspirator Rule 801 statements.

I apply the standard used in other jurisdictions, and would not permit the trial court to admit statements under the coconspirator hearsay exception unless and until evidence is presented "sufficient to support a finding" of a conspiracy. Rule 104(b), W.R.E. Absent sufficient evidence to support that finding, the statements should not be made admissible by subsequent trial evidence, except in the abnormal situation to be discretionally handled by conditional introduction which should normally occur in the strict or classical conspiracy prosecution. Annot., *Paoli v. United States,* Admissibility as against conspirator of extrajudicial declarations of coconspirator—Supreme Court cases, 1 L.Ed.2d 1780 (1956);

Marcus, Prosecution and Defense of Criminal Conspiracy Cases, § 505[3][b] at 5–75 (strict conspiracy); Annot., 44 A.L.R.Fed. 627, 643 (1979); Annot., 46 A.L.R.3d 1148 (1972). See also *United States v. Washita Construction Co.,* 789 F.2d 809, 821 (10th Cir.1986); *United States v. Petersen,* 611 F.2d 1313 (10th Cir.1979), cert. denied 447 U.S. 905, 100 S.Ct. 2985, 64 L.Ed.2d 854 (1980).

"Before a coconspirator's statement may be admitted pursuant to Rule 801(d)(2)(E), the State is required to establish a proper foundation, showing that the requisite elements of this rule have been satisfied. Specifically, we require that the State show (1) that a conspiracy exists, (2) membership of the declarant coconspirator and the defendant in such conspiracy, and (3) that the declaration was uttered in the course of and in furtherance of the conspiracy. See e.g., *United States v. Womochil* (8th Cir. 1985), 778 F.2d 1311, 1314; *United States v. Perez* (9th Cir.1981), 658 F.2d 654, 658.

"The District Court, pursuant to Rule 104, M.R.Evid., is required to determine whether the requirements of Rule 801(d)(2)(E) have been met. In reaching this determination, we now require that before such testimony be admitted, the District Court find that a conspiracy exist by a preponderance of the independent evidence. Stated differently, we require that the State show the existence of the conspiracy by a preponderance of the evidence independent and exclusive of the coconspirator's statement itself. "While we note that the order of proof is typically within the discretion of the trial judge, we further require that the District Court make this admissibility determination prior to the introduction of the alleged coconspirator's statement." *State v. Stever,* supra, 732 P.2d at 857.

The rule for "preferred order of proof" and "burden of proof" was capsulized and carefully defined by Judge Barrett of the Tenth Circuit Court of Appeals in *United States v. Peterson,* supra, as reenunciated in *United States v. Metropolitan Enter-*

*prises, Inc.,* 728 F.2d 444, 448–449 (10th Cir.1984), and should be adopted as fair and workable to be emplaced by this court both by case adjudication and in supervisory responsibility:

"Under Rule 801(d)(2)(E) of the Federal Rules of Evidence, an out-of-court statement is not hearsay if it is offered against a party and is a statement by a co-conspirator of a party during the course and in furtherance of the conspiracy. Admissibility of such statement, however, is dependent upon the establishment of proof by a preponderance of the evidence that 1) there was a conspiracy; 2) the declarant and the particular defendant were members of the conspiracy; and 3) the statement was made during the course of and in furtherance of the conspiracy. * * * In *United States v. Petersen,* 611 F.2d 1313 (10th Cir. 1979), cert. denied, 447 U.S. 905, 100 S.Ct. 2895, 64 L.Ed.2d 854 (1980), we suggested certain procedures, referred to as the 'preferred order of proof,' to guide the district courts in this Circuit in deciding whether to admit hearsay statements of co-conspirators. This 'preferred order of proof' procedure recommends that:

" '(1) The judge alone, pursuant to Rule 104(a) Fed.R.Evid., makes the determination as to admissibility of hearsay co-conspirator statements.

" '(2) The Court makes a threshold determination based upon substantial independent evidence.

" '(3) It is preferable whenever possible to require the government to first introduce independent proof of the conspiracy and subsequent thereto, to establish the connection of the defendant with the conspiracy before admitting hearsay declarations of co-conspirators.

" '(4) At the conclusion of all the evidence, the district court must determine as a factual matter whether the prosecution has shown by a preponderance of the evidence independent of the statement itself (a) that a conspiracy existed; (b) that the co-conspirator and the defendant against whom the co-conspirator's statement is offered were members of the conspiracy; (c) that the statement was made during the course and in furtherance of the conspiracy. If the district court concludes at this stage of the proceeding that the prosecution has not met its burden of proof on these issues, the statement should not be submitted in evidence.' "

*United States v. Washita Construction Co.,* supra; *United States v. Petersen,* supra; *United States v. Andrews,* 585 F.2d 961 (10th Cir.1978). See also in other circuits where the same general approach is taken, although variously phrased, *United States v. Scott,* 795 F.2d 1245 (5th Cir. 1986); *United States v. Holloway,* 731 F.2d 378 (6th Cir.), cert. denied 469 U.S. 1021, 105 S.Ct. 440, 83 L.Ed.2d 366 (1984); *United States v. Williams,* supra, 668 F.2d 1064; *United States v. Vinson,* 606 F.2d 149 (6th Cir.1979), cert. denied 444 U.S. 1074, 100 S.Ct. 1020, 62 L.Ed.2d 756, reh. denied 445 U.S. 972, 100 S.Ct. 1668, 64 L.Ed.2d 251 (1980); *United States v. James,* 590 F.2d 575 (5th Cir.), cert. denied 442 U.S. 917, 99 S.Ct. 2836, 61 L.Ed.2d 283 (1979). A different rule encompassing the Bell–Petrozziello rule exists in the First and Eighth Circuits. *United States v. Drougas,* 748 F.2d 8 (1st Cir.1984); *United States v. Ciampaglia,* 628 F.2d 632 (1st Cir.), cert. denied 449 U.S. 956, 101 S.Ct. 365, 66 L.Ed.2d 221 (1980); *United States v. Petrozziello,* 548 F.2d 20 (1st Cir.1977); *Llach v. United States,* 739 F.2d 1322 (8th Cir.1984); *United States v. Bell,* 573 F.2d 1040 (8th Cir.1978).

In stating the preferred process and proper standard, it is apparent that I am called to reject countervailing procedure unjustifiably created without broadly placed precedential support in *Dorador v. State,* Wyo., 711 P.2d 417 (1985), and *Jasch v. State,* supra, 563 P.2d 1327.

## PROSECUTORIAL MISCONDUCT

I am concerned that this court and the trial courts in Wyoming dismiss too casually the problem of prosecutorial misconduct. In the course of the barrage of Campbell County grand jury cases, we have seen virtually every type of prosecutorial misbe-

havior imaginable, which in this case occurred on cross-examination when the prosecutor asked the defendant:

"Q. Okay. From June 6th to June 26th, you had friends over and you used drugs inside that trailer?

"A. No, I did not.

"Q. Well, weren't you in bed with that man right back there when you were arrested and he had drugs?

"MR. WEERTS: I object, and I ask to approach the bench.

"THE COURT: Yes, you may approach."

The following exchange took place:

"MR. WEERTS: I'd ask for a mistrial now. I think bringing up what Mr. Murray just did has totally ruined this case. She cannot get a fair trial, and I think that we must have a mistrial at this point. Bringing up the fact that she was arrested in bed with that man has nothing to do with the case.

"MR. MURRAY: There were drugs.

"THE COURT: It doesn't have anything to do with the case. The fact that she might have been doing drugs, might have had drugs might have something to do with it, but the fact that she might have been in bed with someone has absolutely nothing to do with the case at all.

"And I'm going to admonish the jury that they will not, they will disregard that question and any possible answers, and I'll warn you not to bring up those kinds of things again."

The trial court took the defendant's motion for mistrial under advisement and then admonished the jury:

"THE COURT: Ladies and gentlemen, I want to tell you that you are to disregard that last question asked by Mr. Murray. The question is of no significance to this case and has absolutely nothing to do with the guilt or innocence of the defendant, and you are to disregard it totally and any answer that might have been given to that.

"You're not to consider it when you deliberate this case."

In the course of the trial court's later ruling on the motion for mistrial, counsel for the defendant stated:

"I would ask the court to declare a mistrial in this case, and the court, the court record I'm sure is clear as to what was said by Mr. Murray in cross-examination of my client, Tammy Burke.

"As I remember the situation, Mr. Murray turned himself around, pointed to my client's boyfriend, who was sitting in the back of the courtroom. He has long hair, he is dressed in a T shirt and a vest, and pretty much, I'd say, looks like a hippie or a motorcycle fellow or something on that order, points to him and asks my client about being arrested with this man while she's in bed with him.

"And, as I understand it, Mr. Murray's reason for doing that was cross-examination as to whether she knew anyone in her house over a period of time and whether that person ever had drugs in the house.

"I think that it's clear that the real reason for Mr. Murray doing what he did was to prejudice the jury against my client, and it's God awful as far as prejudice.

"I mean, here we have thirteen citizens sitting up there and they hear something like this, and they're expected to put it out of their minds? I think it's impossible.

"I think it's a flagrant violation of due process, my client's right to a fair trial.

"I'd also ask that we not only have a mistrial but that the case be dismissed with prejudice. My reason for that is clear. I have been in situations before where the prosecutors have just been fumbling around and a mistrial occurs because they haven't really known what they're doing.

"In this case Mr. Murray knew exactly what he was doing. It was a calculated thing. He did it on purpose. He wanted to. He knew what he was doing, and he did it, and it was just disastrous to my client's rights, to any kind of right to a fair trial. I don't think the jury can forget it, and that's why I ask for the mistrial."

The trial court ruled:

"THE COURT: Well, my ruling is that it is improper cross-examination. I don't

think it's improper to ask her about the drugs.

"Though I don't think it's improper to ask her about the drugs, I think the manner in which you asked it, Mr. Murray, when you asked, and I think Mr. Weerts is right—in very graphic detail— about whether she was in bed with this fellow was I think putting it very nicely—that you pointed to the rather sleazy-looking individual in the back of the courtroom and asked whether or not there were drugs in bed with the two of them when she was arrested. It's the fact that she is with him.

"And the fact there were drugs is, of course, not prejudicial or not inflammatory in any way. But, to point out to the jury that this woman, who is a married woman, was in bed with this guy, I think that that is prejudicial.

"I'm not going to grant the mistrial * * *.

\* \* \* \* \* \*

"I would warn you, Mr. Murray, that I don't believe that that's proper cross-examination, and it's now on the record that I don't believe it is proper cross-examination.

"If it happens in any other instances, you've been warned about it, and I think that if it happens again it would put credence in Mr. Weerts' theory that it was done in a calculated manner, and if that's the case, I will find it highly objectionable under those circumstances.

"I don't believe however that it has so prejudiced the defendant in the eyes of

the jury that she cannot receive a fair trial in this matter so I deny the motion for his [mis]-trial.

\* \* \* \* \* \*

"* * * If we have anything remotely similar to this and it comes up again, I'm going to be very concerned about your motives for doing it, Mr. Murray.

\* \* \* \* \* \*

"[I]t's my belief that my admonition to the jury was sufficient to take care of the problem in this case."

Although I would hold that the grand jury's impropriety in this case was sufficient to warrant reversal, I will also address whether the trial court's admonition to the jury was sufficient to avoid error. It is certainly important to deplore the improper tactics employed by the prosecution. This court needs to send a clear message to prosecutors and trial courts that governmental officials who serve in the justice delivery system must adhere to high standards of conduct, and that district courts should more rigorously police any questionable actions. Perhaps only this court's willingness to reverse those ill-obtained convictions will induce discontinuance and assure the basic procedural guarantees of fairness to which the defendant is constitutionally entitled.[5]

Warning, admonition, supervision, or whatever aside, the first and immediate question is whether misconduct *in this case*, irretrievably invades the jury process so that fairness and evenhanded evaluation by the jury could not be reclaimed for the

---

**5.** We should adopt with appreciative concurrence the thoughtful conclusion of Justice Frank D. Celebrezze in his fair and concerned analysis, *Prosecutorial Misconduct: Quelling the Tide of Improper Comment to the Jury,* The Prosecutor, Vol. 21 No. 1 Summer 1987, at 51, 54:

"It would be a disservice to the profession to give any credence to a suggestion that most prosecutors are ruthless avenging angels who would go to any length for a guilty verdict. It has been my experience, both as a trial and appellate judge, that the overwhelming majority of prosecutors are hardworking, deeply conscientious attorneys who desire to see that justice is done, rather than to add another conviction to their record. These prosecutors

are undoubtedly dismayed when the reputation of their profession is diminished by rebukes for improper or unethical argument. "Such prosecutorial misconduct need not be an inevitable byproduct of our criminal justice system. Through education, diligence and vigilance at trial, the bench and bar must encourage respect for the standards which guide responsible argument. Prosecutors must stress that proper argument is the most effective and efficient means to the ends of justice and a fair trial. Preventing the occurrence of improper argument is far preferable to leaving it to the courts to reverse convictions or impose sanctions after the damage has already been done."

defendant. Surreptitious interdiction of bad character is surrogate evidence of guilt. See my dissenting discussion in *Brown v. State*, Wyo., 736 P.2d 1110, 1117–1125 (1987), Prior Bad–Acts Testimony Introduced For Substantive Evidence of Guilt. See also *Berger v. United States*, 295 U.S. 78, 55 S.Ct. 629, 79 L.Ed. 1314 (1935); and as a foundational discussion, Gershman, Prosecutorial Misconduct, Ch. 9, Misconduct in the Presentation of Evidence, at 9–1.

The practical ineffectiveness of the limiting instruction was comprehensively discussed in my dissent in *Clarke v. Vandermeer*, Wyo., 740 P.2d 921, 929 (1987), but in the more prejudicial circumstances here evidenced we should be reminded in both the search for justice and supervisory responsibility to deter prosecutorial misconduct. The limited benefit, if not the augmenting factor of the limiting instruction, has frequently been considered in the emotionally effectuating circumstance criteria by the United States Supreme Court. Justice Brennan, in *Bruton v. United States*, 391 U.S. 123, 129, 88 S.Ct. 1620, 1624, 20 L.Ed.2d 476 (1968), stated:

" 'The fact of the matter is that too often such admonition against misuse is intrinsically ineffective in that the effect of such a nonadmissible declaration cannot be wiped from the brains of the jurors. The admonition therefore becomes a futile collocation of words and fails of its purpose as a legal protection to defendants * * *.' " Quoting from *Paoli v. United States*, 352 U.S. 232, 247, 77 S.Ct. 294, 302, 1 L.Ed.2d 278 (1957),

and:

"It has been suggested that the limiting instruction actually compounds the jury's difficulty in disregarding the inadmissible hearsay. See Broeder, The University of Chicago Jury Project, 38 Neb.L. Rev. 744, 753–755 (1959)." Id. 391 U.S. at 129, n. 4, 88 S.Ct. at 1625, n. 4.

In a concurring opinion in *Krulewitch v. United States*, 336 U.S. 440, 453, 69 S.Ct. 716, 723, 93 L.Ed. 790 (1949), Justice Jackson, in concurrence, stated:

" * * * The naive assumption that prejudicial effects can be overcome by instructions to the jury * * * all practicing lawyers know to be unmitigated fiction."

See Project, *Sixteenth Annual Review of Criminal Procedure: United States Supreme Court and Courts of Appeals 1985–1986*, Prosecutorial Misconduct, 75 Geo.L.J. 713, 1094 (1987).[6] We should not ignore the complete principle as well established in Wyoming law that

\* \* \* \* \* \*

"We recognize that a trial is not an afternoon tea or other polite social event. On the other hand, it is not trial by combat. The courts, over the years, have laid out carefully delineated boundaries in which the adversaries are free to fight. Contests are, however, confined to the area within the boundaries and governed by specific rules. It is counsel's duty to abide by the rules and remain within the boundaries.

"The prosecutor in this case was admonished by the court for questionable conduct on at least twelve different occasions. Additionally, on at least one of those occasions, she was threatened with a $500 fine for contempt of court.

"Although the trial judge did 'keep the lid on' the proceeding, perhaps he should have been a little less paternal and a little more authoritative. If that had occurred, we think it likely that many of the issues raised in this appeal would have been aborted at trial."

---

**6.** The subject of prosecutorial misconduct is editorially noticed in substantial review and analysis. In addition to Gershman, Prosecutorial Misconduct, supra, see Celebrezze, *Prosecutorial Misconduct: Quelling the Tide of Improper Comment to the Jury*, supra. See also Alschuler, *Courtroom Misconduct by Prosecutors and Trial Judges*, 50 Tex.L.Rev. 629 (1972); Singer, *Forensic Misconduct by Federal Prosecutors—and How It Grew*, 20 Ala.L.Rev. 227 (1967); King, *Prosecutorial Misconduct: The Limitations Upon the Prosecutor's Role as an Advocate*, 14 Suffolk U.L.Rev. 1095 (1984). I am not easily able to accept the admonition answer, even though involving a case of clear murder guilt, as evidence in a recent Maryland case, *Tibbs v. State*, 72 Md.App. 239, 528 A.2d 510, 512, 520 (1987):

"But for the fact that the evidence against Mark Tibbs was overwhelming, despite the assistant State's attorney's efforts to snatch defeat from the jaws of victory, we would reverse this case and remand it for a new trial. Our review of the record, however, convinces us that the prosecutor's misdirected zeal did not deny Tibbs due process of law.

"[a]ppropriate objections \* \* \* and subsequent curative instructions by a trial court may cure any error \* \* \* [but we] reverse for prosecutorial misconduct *if it results in substantial prejudice.*" (Emphasis added.) *Lindsey v. State*, Wyo., 725 P.2d 649, 656 (1986).

See also *Hays v. State*, Wyo., 522 P.2d 1004 (1974); *Peterson v. State*, Wyo., 586 P.2d 144 (1978). Substantial prejudice is easily achieved by the prosecution fueled by adverse character forejudgment.

For these various reasons, I would reverse the conviction.